No. 106,021

STATE OF KANSAS, *Appellee*, v. LOVISS TODD, *Appellant*.

(323 P.3d 829)

Opinion filed April 25, 2014.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Edmond D. Brancart*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Loviss Todd appeals his jury convictions and sentence on charges of felony murder, aggravated robbery, aggravated battery, and aggravated assault. Todd raises seven issues: (1) failure to provide a cautionary jury instruction on accomplice testimony; (2) error in the jury instruction on reasonable doubt; (3) failure to instruct the jury on second-degree murder as a lesser included instruction of felony murder; (4) error in the eyewitness identification jury instruction; (5) prosecutorial misconduct; (6) cumulative trial error; and (7) inclusion of lifetime postrelease supervision as part of his life sentence. We affirm Todd's

convictions and vacate the lifetime postrelease supervision portion of his life sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

Todd's convictions arose out of events at the Kansas City home of murder victim Vincent Green. Todd and Ayreone Alexander and two others arrived at Green's home on the morning of December 8, 2008, with the apparent purpose of settling an earlier drug dispute with Keith McFarlane, another occupant of the home. By the time Todd and Alexander and their two companions left the home, Green had been fatally shot multiple times; McFarlane also had been shot and wounded; 4 pounds of marijuana had been taken from a parked car; and McFarlane's car had been driven away.

At Todd's trial, the State called two eyewitnesses: Warren Jones, who had been a guest at the home, and McFarlane. Alexander, who agreed to cooperate with the State in exchange for reduced charges against her, also testified.

According to Jones, he was watching television and playing video games in the living room of the home when McFarlane received a phone call from someone interested in looking at a used car McFarlane had for sale. McFarlane told Green to answer the door; Todd and Alexander entered; and Todd joined Jones in the living room, where he sat with him on the couch. McFarlane then went outside to get something from his car. At that moment, Todd "stood up and pulled a pistol and told me to get on the ground." Todd pointed the gun at Green and ordered him onto the ground as well. Jones complied. Green did not. Instead, Green walked to the back of the house and said, "[B]ro, what are you doing?" Jones then heard three gunshots followed by a male voice saying, "[G]rab the keys to the car." After a period of time, Jones got up and saw Green's lifeless body lying face down in the kitchen. McFarlane also had been shot.

McFarlane told a similar story during his trial testimony. He said that he had spoken to Alexander several days before the shooting about a car he had for sale. Alexander stopped by the morning of the shooting and told him she was getting money together for the car. Twenty minutes later, Alexander called and said she wanted

to see the car's interior. When she arrived, Todd was with her. McFarlane said he had never seen Todd before. Seconds after McFarlane went outside to check on the car, a man who had been seated in a vehicle parked outside rushed McFarlane and "pulled [a] pistol out on me, grabbed me at the back of my shirt, turned me towards the house[,] and he started walking me back toward the house." McFarlane then heard a gunshot from inside the home, and the man who had been in the vehicle pushed McFarlane into the home and shot him. With wounds in his arm and chest, McFarlane ran into the home's basement. While he paced and bled, McFarlane heard a male voice upstairs scream, "[G]et the keys, get the keys." Eventually, McFarlane went upstairs, where he saw Green lying on the floor, face down. McFarlane also saw Jones, and the pair started to look for their phones. McFarlane then used Jones' phone to dial 911.

On cross-examination, defense counsel questioned McFarlane about his failure to identify Todd at the preliminary hearing as the person who had arrived with Alexander. At the preliminary hearing, McFarlane had said Todd was the person who marched him back inside and shot him. McFarlane testified at trial that he had been mistaken at the preliminary hearing.

Alexander initially faced the same charges as Todd. But she entered into a plea agreement with the State, which required her to testify against Todd and plead guilty to only aggravated robbery and conspiracy to commit aggravated robbery. According to Alexander's version of events, the encounter at Green's home had little to do with a used car and had everything to do with a drug dispute.

Alexander testified that she had purchased marijuana from McFarlane "several times" in the 2 months leading up to the shooting. Three days before the shooting, she brought Todd to Green's home to buy marijuana from McFarlane. Later, Todd complained to Alexander that he had been shorted by 28 grams on the sale. Todd called Alexander several times to complain; eventually Alexander stopped answering his calls.

On the morning of the shooting, Alexander testified, she went to Green's house twice. The first time she paid McFarlane for marijuana he had sold to her the day before. And she told Mc-

Farlane that Todd had been complaining about being cheated. McFarlane told her to bring Todd over and "they'd get it straightened out."

Alexander said she then went to a Kansas City, Missouri, gas station, where she met with Todd; his cousin, Lukie Todd; and Terry Allen. Alexander got out of the car she had been in and joined the three men in their car. Allen was in the driver's seat, and Todd and Lukie were in the backseat "smoking marijuana and snorting cocaine." All three men were armed with handguns, and they were talking about getting Todd's money back from McFarlane. Alexander told them that McFarlane had invited Todd over to Green's home.

The foursome then traveled to Green's home. Alexander called McFarlane and told him that she and Todd were on their way. On arrival, Alexander and Todd went into the home while the two others waited in the car. Green answered the door, and Jones and McFarlane were inside. When McFarlane went outside to get something out of his trunk, Alexander watched him through window blinds. She saw Lukie approach McFarlane with a gun, grab him, and direct him back inside the home. As McFarlane and Lukie entered the door, Todd pulled out his gun and told everyone to get on the ground. Alexander said that both Jones and Green got on the ground, but Green "kept moving and he got back up and he was telling [Todd] he didn't have anything to do with it and he ran to the kitchen." Green "had his hands up saying he didn't have anything to do with it." As Green made his way to the kitchen, Todd shot him in the back and Lukie shot him in the front. At that point, McFarlane "broke loose" and Lukie shot him as well. McFarlane then ran out of Alexander's sight. During the gunfire, Alexander said, she stood by "in shock."

After the shooting stopped, Todd went outside, but then came back in to get McFarlane's keys. When the keys were found, Todd drove away in McFarlane's car. Lukie took a package containing 4 pounds of marijuana from a car parked in the yard, and then he and Allen and Alexander left in the car in which they had arrived.

Todd relied on an alibi defense at trial. Two of his aunts and a cousin testified on his behalf. One aunt testified that Todd and

Lukie were both at her home until 7:15 a.m. on the morning of the shooting. Another aunt, who lived across from the gas station where Alexander said she had met with Todd on the morning of the shooting, testified that she did not see Alexander, Todd, or Lukie that morning. She conceded on cross-examination that she did not "sit in the window every minute of the day."

Todd's cousin, Tylise Horton, testified that Todd and Lukie were with her on the morning of the shooting until they drove her to school at 11 a.m. She said they picked her up again at 12:20 p.m. Defense counsel relied on this testimony to argue that Todd did not have enough time between 11 and 12:20 to have committed the crimes at Green's home. On cross-examination, the prosecutor questioned Horton on why she had made no previous statement to the police about Todd's whereabouts on the morning of the shooting. The prosecutor also asked Horton if she had ever been on probation and, if so, for what offense. Horton asked the district court judge, "Do I have to answer that?" When the district judge said, "Go ahead," Horton said she had been on probation for "stealing." On redirect, defense counsel asked Horton if she would lie to protect Todd. She said she would not. On recross, the prosecutor asked her, "You wouldn't lie, but you would steal?" Horton replied, "Actually, I wasn't stealing. I was an accessory."

At the jury instructions conference, Todd's counsel did not object to or request any jury instructions other than those proposed by the district judge.

During the first part of his closing argument, the prosecutor addressed the evidence in support of Todd's alibi:

"If Tylise Horton's testimony failed, then all the alibi defense failed. You can find from the evidence that her testimony did fail. You can determine to give her testimony no weight at all. . . . [T]he other two alibi witnesses were nice people, but their testimony just simply did not cover the timeframe during which the events happened. If—they would have corroborated Tylise, perhaps, if Tylise's testimony had not failed.

"You can find that she lacks credibility from her bias, from the fact that she has established that she will deceive others. Theft is a crime of deception. She did not want to tell you about it. Remember, she asked the judge if she had to tell you. She would have preferred to deceive you about her own criminal history.

And then she dotted the [i] when she told you that she was an accessory, that she had helped another person commit a crime of deception.

"She was trying to help Loviss Todd, she was not credible and you can discount her testimony completely and find this defendant guilty of felony murder, aggravated robbery, aggravated battery[,] and aggravated assault."

In the rebuttal portion of his closing, the prosecutor returned to the subject of Horton's testimony:

"If [Horton] is coming here to provide compelling evidence from—about a relative of hers that she feels deeply for, and it's a relevant question, where is other corroboration about that?

"Much like what the State showed you in terms of corroboration from its witnesses. . . . [W]e talked about how she must have known these things for two, two and a half years and didn't go banging on every door possible to tell the authorities, hey, you have the wrong guy.

"So you can find that she lacks credibility."

## ACCOMPLICE WITNESS INSTRUCTION

Todd's first claim of error is that the district judge should have given a cautionary instruction on testimony from accomplice witnesses. The instruction, PIK Crim. 3rd 52.18, reads: "An accomplice witness is one who testifies that [she] was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

As mentioned above, Todd did not seek this instruction at trial. This means we will not reverse because of its absence unless the omission qualifies as clearly erroneous.

"K.S.A. 22-3414(3) creates a procedural hurdle for a party that fails to object to or request a jury instruction:

" 'K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court.' [*State v. Williams*,] 295 Kan. 506, Syl. ¶ 3[, 286 P.3d 195 (2012)].

"The determination of whether an instruction is clearly erroneous employs a two-step process. First, 'the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider

whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' 295 Kan. 506, Syl. ¶ 4. If error is found, then we proceed to the second step of assessing whether we are firmly 'convinced that the jury would have reached a different verdict had the instruction error not occurred.' " *State v. Cruz*, 297 Kan. 1048, 1066-67, 307 P.3d 199 (2013).

A defendant who fails to request an omitted instruction bears the burden of establishing clear error under K.S.A. 22-3414. *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012).

Under this rubric, our first task is to determine whether the accomplice witness cautionary instruction was legally and factually appropriate.

Such an instruction is legally appropriate when an accomplice witness testifies, provided the accomplice is not also a codefendant in the trial. See *State v. Llamas*, 298 Kan. 246, 262-63, 311 P.3d 399 (2013) (requested accomplice testimony cautionary instruction legally appropriate); *State v. Tapia*, 295 Kan. 978, 996, 287 P.3d 879 (2012) (unrequested accomplice testimony instruction legally appropriate); but see *State v. Crume*, 271 Kan. 87, 93, 22 P.3d 1057 (2001) (accomplice instruction never an absolute necessity, subject to judge's discretion; may properly refuse to give instruction when defendant's guilt is plain) (quoting *State v. DePriest*, 258 Kan. 596, 606, 907 P.2d 868 [1995] [quoting *United States v. Becker*, 62 F.2d 1007, 1009 (2d Cir. 1933)]). Regardless of whether the accomplice witness' testimony is corroborated, we have held that it is the better practice for a trial judge to give such an instruction. See *Tapia*, 295 Kan. at 996 (quoting *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 [1981]; citing PIK Crim. 3d 52.18, Notes on Use).

Factual appropriateness in a particular case turns on the status of the witness at issue. "[T]echnically the term 'accomplice witness' applies only when one who has been involved in the commission of a crime is called to testify against another during the course of a trial." *State v. Simmons*, 282 Kan. 728, 737, 148 P.3d 525 (2006). Mere presence during the planning or commission of a crime does not make one an accomplice. *Llamas*, 298 Kan. at 263 (citing, discussing cases). In order to be an accomplice witness within the meaning of PIK Crim. 3rd 52.18, " 'the witness must have been

involved in the commission of the crime with which the defendant is charged.' " *Llamas*, 298 Kan. at 264 (quoting *State v. Davis*, 283 Kan. 569, 580, 158 P.3d 317 [2006]; citing, discussing cases).

Here, the State does not contest that Alexander qualified as an accomplice witness at Todd's trial. She was not a codefendant in his trial. Yet she had been convicted of aggravated robbery and conspiracy to commit aggravated robbery based on her participation in Todd's alleged crimes. We hold that the district judge's failure to give the accomplice witness cautionary instruction in these circumstances was error.

The State argues that Todd invited the error by failing to request the instruction. This argument is wholly without merit. The absence of a request for the instruction means that Todd bears a heavier burden to obtain reversal on appeal but not that he is entirely foreclosed from pursuing the issue. See K.S.A. 22-3414(3); *Williams*, 295 Kan. at 518 (although defendant "must assume at least some of the responsibility for the omitted instruction by failing to request it," that failure alone not invited error).

We next move to the question of whether the omission of the instruction qualified as clearly erroneous and thus reversible. When we analyze

"whether the failure to give an accomplice instruction was reversible error, this court [must] examine[] the extent and importance of an accomplice's testimony, as well as any corroborating testimony. *Tapia*, 295 Kan. at 997; *State v. Simmons*, 282 Kan. 728, 740, 148 P.3d 525 (2006); see *State v. Moody*, 223 Kan. 699, 702, 576 P.2d 637 (failure to give accomplice instruction can create trial error, particularly when the accomplice testimony is uncorroborated), *cert. denied* 439 U.S. 894 (1978)." *Llamas*, 298 Kan. at 265.

We recognize that

" 'no reversible error occurs due to a trial court's failure to give a cautionary accomplice witness instruction if a witness' testimony is corroborated by other evidence and the witness' testimony does not provide the sole basis for a resulting conviction. [Citations omitted.] . . . .

" 'Further, a failure to provide the jury with the cautionary accomplice witness instruction . . . is not error when the defendant's guilt is plain or when the jury is cautioned about the weight to be accorded testimonial evidence in other instructions. [Citation omitted.]' " *Tapia*, 295 Kan. at 997 (quoting *Simmons*, 282 Kan. at 740).

Todd argues that "Alexander provided the key testimony for the State to obtain a conviction" and that the jury had to believe Alexander's testimony in order to convict. He minimizes the value of the testimony of Jones and McFarlane; because Jones had never seen Todd before the morning of the shooting, and McFarlane made "contradictory identifications."

We are not judges of witness credibility. See *State v. Jones*, 295 Kan. 1050, 1057-58, 288 P.3d 140 (2012). But, from the perspective of substance alone, the testimony of Jones and McFarlane cannot be so lightly dismissed. Although Alexander testified extensively to the circumstances surrounding the shooting and provided context for Todd's behavior, she was far from the sole basis for Todd's convictions. Jones also testified about Todd pulling out his gun and ordering him and Green to the floor. Jones told the jury about Green's failure to comply and Todd shooting Green in the back. McFarlane testified that he saw Todd enter the home and then heard a gunshot. Jones and McFarlane also substantially corroborated Alexander's testimony about Todd leaving in McFarlane's car.

We also note that the district judge provided the jury with a general instruction on witness credibility, and that there was overwhelming evidence of Todd's guilt. See *Tapia*, 295 Kan. at 998. Both of these factors would have tended to ameliorate the omission of the accomplice witness cautionary instruction.

We therefore hold that the district judge's failure to instruct the jury *sua sponte* on the caution it should exercise in evaluating Alexander's accomplice witness testimony was not clearly erroneous. Todd is not entitled to reversal of his convictions on this issue.

## REASONABLE DOUBT INSTRUCTION

Todd next claims that the district judge committed structural error when he used an older version of the PIK Crim. 3d 52.02 jury instruction on reasonable doubt. The instruction read:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." (Emphases added.)

We have repeatedly rejected the argument that this instruction requires reversal. See *State v. Holt*, 298 Kan. 531, 539, 314 P.3d 870 (2013); State *v. Herbel*, 296 Kan. 1101, 1124, 299 P.3d 292 (2013), and Todd has not persuaded us that the result or rationale of these cases was incorrect. He is not entitled to relief on this issue.

## Second-Degree Murder Instruction

Todd's third claim on appeal is that the district judge was required to instruct *sua sponte* on second-degree intentional murder as a lesser included offense of felony murder. Again, because this lesser included instruction was neither requested nor its omission objected to, we will not reverse on this basis unless there was clear error.

Under K.S.A. 22-3414(3), a trial court must provide lesser included offense instructions "where there is some evidence which would reasonably justify a conviction of some lesser included crime." At the time of Todd's trial, however, felony-murder cases were excluded from application of K.S.A. 22-3414(3) under a court-made exception to the general rule. See *State v. Becker*, 290 Kan. 842, 856-57, 235 P.3d 424 (2010). The exception required lesser included offense instructions in felony-murder cases only if the evidence of the underlying felony was weak, inconclusive, or conflicting. 290 Kan. at 857.

Several caselaw and statutory developments since Todd's trial affect resolution of this claim on his appeal.

The first of these developments was our decision in *State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011). *Berry* abandoned the court-made felony-murder exception to application of K.S.A. 22-3414(3). 292 Kan. at 513. It also stated that its holding would be applied to all cases then pending on appeal, which would have included this one. 292 Kan. at 514. Todd's brief to this court in-

voked *Berry* to support his argument that the district judge's failure to instruct *sua sponte* on second-degree murder was clear error.

The legislature quickly responded to our *Berry* decision, eliminating all lesser included offenses of felony murder by statutory amendment in 2012. See K.S.A. 2013 Supp. 21-5109(b)(1); L. 2012, ch. 157, sec. 2. In this case, the State attempted to invoke this amendment to argue that our *Berry* decision had been legislatively overruled and that the amendment should be applied retroactively to Todd; it cited an earlier, later-substituted bill, however.

The next development came when we were called upon to interpret the 2012 amendment in the felony-murder case of *State v. Wells*, 297 Kan. 741, Syl. ¶ 8, 305 P.3d 568 (2013). In that case, we first examined the language of the amendment to determine whether the legislature intended it to be applied retroactively. The general rule is that statutes operate only prospectively unless there is clear legislative language to the contrary. 297 Kan. at 761 (citing *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 [2001]; *State v. Sisk*, 266 Kan. 41, 44, 966 P.2d 671 [1998]). Finding no clue in the text, we evaluated whether the amendment fit an exception to the prospective-only rule for statutes that are merely procedural or remedial rather than likely to prejudice the substantive rights of the parties. *Wells*, 297 Kan. at 761. Concluding that the amendment was substantive, we held that it was not intended to be applied retroactively. This holding eliminated any need to determine whether retroactive application of the amendment would violate the federal Ex Post Facto Clause. We held defendant Melissa Wells could have invoked the rule of *Berry* to argue for the appropriateness of lesser included offense instructions on her felony-murder charge. 297 Kan. at 761-62. But, because the record on her appeal did not contain "some evidence reasonably justifying a conviction of some lesser included crime beyond a reasonable doubt," the district court's failure to give the instructions was not error. 297 Kan. at 762.

In 2013, the legislature continued what had become a classic interbranch conversation by passing another statutory amendment. See L. 2013, ch. 96, sec. 2. Legislators added subsections (d) and

(e) to the definition of murder in the first degree in K.S.A. 2013 Supp. 21-5402. The new subsection (d) reiterated that felony murder had no lesser included offenses. The new subsection (e) stated expressly that the 2013 amendment was a procedural rule to be applied retroactively to any case currently pending.

This is where Todd's case enters the scene. Although neither he nor the State has filed a supplemental brief or submitted a Rule 6.09 (2013 Kan. Ct. R. Annot. 50) letter to address *Wells* or the responsive 2013 amendment, and neither counsel addressed these two developments or potential violation of the federal Ex Post Facto Clause at oral argument, we address these developments and this issue to determine whether Todd was entitled to an instruction on second-degree murder.

Our first observation is that *Wells* does not answer the Ex Post Facto question. In *Wells*, we ruled only on the initial issue arising when an intervening statutory amendment may apply on appeal to a case tried before the amendment took effect, *i.e.*, did the legislature intend the amendment to be applied retroactively? In the absence of guiding language from the legislature and what we deemed to be a substantive effect of the amendment abolishing lesser included offenses of felony murder, we answered the question "no."

Now that the legislature's 2013 amendment has expressly provided for an abolition of lesser included offenses of felony murder to be retroactively applied to cases pending on appeal, the procedural-versus-substantive analysis used in *Wells* to help us determine legislative intent is unnecessary. Likewise, the legislature's designation of the 2013 amendment as procedural is as irrelevant as it would have been ineffective. See *Collins v. Youngblood*, 497 U.S. 37, 46, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990) (labeling law "procedural" does not immunize it from ex post facto scrutiny; subtle ex post facto violations no more permissible than overt ones).

With these premises as our baseline, we turn to the question of whether application of the 2013 statutory amendment to reject Todd's claim that he was entitled to a lesser included instruction on second-degree murder would violate the federal Ex Post Facto Clause.

The legislature alone has the authority to define crimes and pre-
scribe punishments. *State v. Beard*, 274 Kan. 181, 185, 49 P.3d
492 (2002); *State v. Reed*, 248 Kan. 792, 798, 811 P.2d 1163 (1991).
But this authority and its companion power to explicitly declare a
statute retroactive are not unlimited; neither the statute itself nor
its retroactive application may offend the federal or state Consti-
tutions. See *State v. Barnes*, 278 Kan. 121, 129, 92 P.3d 578 (2004)
(citing *Sammons v. Simmons*, 267 Kan. 155, 162, 976 P.2d 505
[1999]).

Article I, § 10, of the United States Constitution states simply
that "[n]o State shall . . . pass any . . . ex post facto [l]aw." We have
no echoing or comparable provision in the Kansas Constitution.
Contra *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 430 Md. 535,
551-59, 62 A.3d 123 (2013) (electing to invoke Maryland Consti-
tution to provide broader protection than federal Ex Post Facto
Clause). We therefore look to precedent interpreting the federal
clause.

As we reviewed recently in *State v. Prine*, 297 Kan. 460, 469,
303 P.3d 662 (2013), the United States Supreme Court has said
that the federal clause encompasses:

" ' "1st. Every law that makes an action done before the passing of the law, and
which was innocent when done, criminal; and punishes such action. 2d. Every law
that aggravates a crime, or makes it greater than it was, when committed. 3d.
Every law that changes the punishment, and inflicts a *greater punishment*, than
the law annexed to the crime, when committed. 4th. Every law that alters the
legal rules of evidence, and receives less, or different, testimony, than the law
required at the time of the commission of the offence, in order to convict the
offender." ' " *Stogner v. California*, 539 U.S. 607, 612, 123 S. Ct. 2446, 156 L.
Ed. 2d 544 (2003) (quoting *Calder v. Bull*, 3 U.S. [3 Dall.] 386, 390-91, 1 L. Ed.
648 [1798]. . . .' ").

Laws in these categories " 'and similar laws . . . are manifestly
unjust and oppressive.' " *Stogner*, 539 U.S. at 612 (quoting *Calder*,
3 U.S. [3 Dall.] at 390-91).

In our 1996 decision in *State v. Myers*, 260 Kan. 669, 676-77,
923 P.2d 1024 (1996), *cert. denied* 521 U.S. 1118 (1997), we rec-
ognized that the United States Supreme Court had rephrased its
formulation of the categories of laws raising ex post facto concerns

after *Calder* was decided. In *Beazell v. Ohio*, 269 U.S. 167, 169-70, 46 S. Ct. 68, 70 L. Ed. 216 (1925), the Court said:

" '[A]ny statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*' The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused."

This led us to conclude:

"In *Collins v. Youngblood*, 497 U.S. [at 50], the Court re-adopted the *Calder* categories, as rephrased in *Beazell. Kring v. Missouri*, 107 U.S. 221, 228-29, 27 L. Ed. 506, 2 S. Ct. 443 (1882), was overruled to the extent *Kring* had broadened those categories to include any change which 'alters the situation of a party to his disadvantage.' . . . . Ex post facto laws are particularly objectionable because they deprive their object of all notice. See, *e.g.*, *Miller v. Florida*, 482 U.S. 423, 429-30, 96 L. Ed. 2d 351, 107 S. Ct. 2446 (1987); *Weaver v. Graham*, 450 U.S. 24, 30, 67 L. Ed. 2d 17, 101 S. Ct. 960, 965 (1981)." *Myers*, 260 Kan. at 676-77.

In short, retroactively applied legislation that simply "alters the situation of a party to his disadvantage" does not, in and of itself, violate the Ex Post Facto Clause. The disadvantage, to be unconstitutional under the Clause, must fall within one of the categories recognized in *Beazell*.

In *State v. Cook*, 286 Kan. 766, 770-71 187 P.3d 1283 (2008), we set forth a comprehensive statement of the purposes served and acts prohibited by the Ex Post Facto Clause:

"The framers of the United States Constitution had three purposes in prohibiting retroactive application of laws. First, they sought to assure that legislative acts give fair warning of their effect and permit individuals to rely on those acts until they are explicitly changed. Second, they sought to restrict governmental power by restraining arbitrary and potentially vindictive legislation. Finally, they sought to uphold the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal laws. *Weaver v. Graham*, 450 U.S. 24, 28-29, 67 L. Ed. 2d 17, 101 S Ct. 960 (1981).

" '[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. [Citations omitted.]' *Weaver*, 450 U.S. at 29.

"Not only the retroactive criminalization of an act, but also the retroactive increase in the severity of punishment may violate ex post facto prohibitions. The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty' after the fact. *Calder v. Bull*, 3. U.S. (3 Dall.) 386, 397, 1 L. Ed. 648 (1798). 'An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed.' *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138, 3 L. Ed. 162 (1810). 'Critical to relief under the Ex Post Facto Clause is . . . the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.' *Weaver*, 450 U.S at 30."

See also *Prine*, 297 Kan. at 469 (quoting *Anderson v. Bruce*, 274 Kan. 37, 43, 50 P.3d 1 [2002] [Kansas' two-part restatement of federal prohibition on ex post facto laws requires retroactive application, alteration of "the definition of criminal conduct or [an] increase [in] the penalty by which a crime is punishable."]). Although we have sometimes described the requirement of alteration in definition or increase in punishment in shorthand as mere " 'disadvantage' " to a criminal defendant, see *State v. Chamberlain*, 280 Kan. 241, 247, 120 P.3d 319 (2005) (quoting *Stansbury v. Hannigan*, 265 Kan. 404, 412, 960 P.2d 227, *cert. denied* 525 U.S. 1060 [1998]), we have emphasized that the crucial "question in evaluating an ex post facto claim is whether the [new] law changes the legal consequences of acts completed before its effective date." *Prine*, 297 Kan. at 470 (citing *Weaver*, 450 U.S. at 31; *State v. Armbrust*, 274 Kan. 1089, 1093, 59 P.3d 1000 [2002]).

Here, the legislature eliminated all lesser included offenses of felony murder. In doing so, it did not "change[] any of the elements of the crime of [felony murder], or the matters which might be pleaded as an excuse or justification for the conduct underlying such a charge." *Collins*, 497 U.S. at 50. It did not make a completed innocent act criminal. It did not increase the potential punishment for an act already criminal. It did not deprive Todd of a defense to the charge of felony murder. See 497 U.S. at 49-50; see also *Blair v. Armontrout*, 916 F.2d 1310, 1330-31 (8th Cir. 1990) (Mis-

souri Supreme Court decision, *State v. Blair*, 638 S.W.2d 739 [Mo. 1982], *cert. denied* 459 U.S. 1188 [1983], that first-degree murder not lesser included offense of capital murder under new statutory scheme while defendant's case on appeal applicable without violation of Ex Post Facto Clause; neither definition of capital murder nor accompanying punishment changed between time of murder, time of trial). At all times, Todd had notice that a killing of a fellow human committed in the course of a felony could be prosecuted and punished in Kansas as a first-degree murder under a felony-murder theory. This is exactly what happened.

Under these circumstances, application of the 2013 statutory amendment abolishing lesser included offenses of felony murder to Todd's case does not violate the federal Ex Post Facto Clause. A second-degree murder instruction would not have been legally appropriate. See *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). And the district judge's failure to give the instruction *sua sponte* was not error, much less clear error.

### EYEWITNESS INSTRUCTION

Todd's fourth claim on appeal is that the district judge committed reversible error by instructing the jury on eyewitness identification, using PIK Crim. 3d 52.20.
The instruction at issue, No. 15, read:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:
  1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitation on observation like an obstruction or poor lighting;
  2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;
  3. Whether the witness had observed the defendant(s) on earlier occasions;
  4. Whether a significant amount of time elapsed between the crime charged and any later identification;

5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;
6. *The degree of certainty demonstrated by the witness at the time of any identification of the accused;* and
7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." (Emphasis added.)

Although Todd generally argues that this instruction employs "outdated and even scientifically unsound factors," he principally complains about the sixth factor—the eyewitness' degree of certainty.

In *State v. Mitchell*, 294 Kan. 469, 479, 275 P.3d 905 (2012), this court reaffirmed that a district judge is required to issue a cautionary instruction when "eyewitness identification is a critical part of the prosecution's case *and there is serious question about that identification's reliability."* (Emphasis added.) We also held that the instruction on the reliability of eyewitness identification should omit the degree of certainty factor. 294 Kan. at 481 (instruction places undue weight on certainty evidence). Thus the district judge erred in including the degree of certainty factor when instructing Todd's jury on eyewitness identification. See *State v. Cruz*, 297 Kan. 1048, 1068, 307 P.3d 199 (2013); *State v. Marshall*, 294 Kan. 850, 867, 281 P.3d 1112 (2012).

Because Todd did not object at trial, he

"faces the high burden of convincing us that the inclusion of the degree of certainty factor in the eyewitness identification cautionary instruction was clearly erroneous, *i.e.*, that we are firmly convinced that the jury would have reached a different verdict had the instruction not included the erroneous language." *Cruz*, 297 Kan. at 1068 (citing *Williams*, 295 Kan. 506, Syl. ¶ 5).

Two initial inquiries guide our analysis of whether the erroneous eyewitness instruction affected the verdict: (1) Was the identification crucial to the State's case? and (2) Was there an opinion of certainty stated? *Cruz*, 297 Kan. at 1068; *Marshall*, 294 Kan. at 867-68. If the answer to either of these questions is "no," then the inclusion of the degree of certainty factor would not have actually affected the verdict and, accordingly, would not constitute clear error. See *Marshall*, 294 Kan. at 868 (reviewing for harmless error). If the answer to both questions is "yes," then this court "consider[s]

the impact of the jury instructions in light of the entire record and additional considerations." 294 Kan. at 868. "At this stage, '[t]he appropriate appellate consideration is whether "other procedural safeguards mitigated" the deficiency in the eyewitness instruction.' " *State v. Dobbs*, 297 Kan. 1225, 1238, 308 P.3d 1258 (2013) (quoting *Marshall*, 294 Kan. at 868).

Here, the instruction was not necessary for the jury to give due consideration to Alexander's identification of Todd because she knew him before the commission of the crimes. See *State v. Mann*, 274 Kan. 670, Syl. ¶ 2, 56 P.3d 212 (2002) ("Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary and the accuracy of the identification can be sufficiently challenged through cross-examination."). Jones and McFarlane were in a different position. The erroneous instruction, at least in theory, could have had some bearing on the jury's consideration of their identifications. Those identifications were at least corroborating of Alexander's testimony, if not crucial.

The problem for Todd is that, even if we assume that Jones' and McFarlane's identifications of him qualify as crucial, there was no testimony about either man's degree of certainty. Jones and McFarlane were not asked; they did not volunteer. The mere facts that Jones expressed no equivocation when challenged or that McFarlane said his earlier identification was mistaken were not enough to have made the eyewitness cautionary instruction, although erroneous, reversible.

## PROSECUTORIAL MISCONDUCT

Todd next alleges that prosecutorial misconduct denied him a fair trial.

The two-step process an appellate court uses when reviewing claims of prosecutorial misconduct was recently stated in *State v. Lowrance*, 298 Kan. 274, 282-83, 312 P.3d 328 (2013):

"An appellate court first determines whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. If the comments are found to be improper and therefore misconduct, the court next determines whether the comments prejudiced the jury against the defendant and denied the

defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004). In this step of the process, we consider three factors: First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the mind of a juror? None of these three factors is individually controlling. *Marshall*, 294 Kan. at 857; *State v. Raskie*, 293 Kan. 906, 914, 269 P.3d 1268 (2012).

"In assessing this third factor, this court requires that any prosecutorial misconduct error meet the 'dual standard' of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *Tosh*, 278 Kan. at 97 (Before third factor can ever override first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967], have been met.).

"Under both standards, the party benefiting from the error—here, the State—bears the burden of demonstrating harmlessness. *State v. Bridges*, 297 Kan. 989, [1013,] 306 P.3d 244, 260 (2013); *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is more rigorous when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110. In other words, if the State has met the higher *Chapman* constitutional harmless error standard it necessarily has met the lower standard under K.S.A. 60-261. Hence, we need conduct our analysis only under the *Chapman* harmless error standard, under which

" 'the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

See *State v. Ochs*, 297 Kan. 1094, [1100,] 306 P.3d 294, 299 (2013) (citing *Herbel*, 296 Kan. at 1110-11.)"

Todd takes issue with three comments the prosecutor made about Horton during closing argument. First, Todd argues that that the prosecutor impermissibly expressed a personal opinion on Horton's credibility when he stated "[S]he was not credible" and "[s]he would have preferred to deceive you about her own criminal history." Next, Todd contends that the comment about Horton's preference for deception was intended to inflame the passions and prejudices of the jurors. Finally, Todd claims that the prosecutor shifted the burden of proof during the rebuttal portion of closing

argument by mentioning Horton's failure to come forward earlier with her support for Todd's alibi.

The State responds that the "prosecutor's approach was to usher the jury through its task" and that, understood in context, he did not express a personal opinion on credibility. The State also argues that the prosecutor's statements in the rebuttal portion of closing were proper responses to argument made by Todd's counsel.

A prosecutor may not express personal opinions about the credibility or reliability of a witness. *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). But a prosecutor may offer "the jury an explanation of 'what it should look for in assessing witness credibility.' " *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009) (quoting *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 [2008]). "There is a distinction between such proper argument and its improper twin, argument on the prosecutor's personal belief or opinion about a witness' credibility. See *State v. Finley*, 273 Kan. 237, 245-46, 42 P.3d 723 (2002)." *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011). A prosecutor does not commit misconduct when arguing witness credibility based on reasonable inferences from the evidence presented at trial. *Marshall*, 294 Kan. at 863. Moreover, "Kansas courts have consistently held that '[e]xposing bias or motive for testifying is a proper subject for cross-examination,' and, 'by extension, the prosecutor is free to argue this point to the jury if the evidence has established the facts.' " *State v. Wells*, 297 Kan. 741, 752, 305 P.3d 568 (2013) (quoting *State v. Jones*, 273 Kan. 756, 783, 47 P.3d 783 [2002]).

Recently, in *State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014), this court addressed an allegation of prosecutorial misconduct based on a prosecutor's comments on the credibility of witnesses. This court outlined the statements that defendant Michael Akins, Jr., alleged were impermissible:

"In her opening statement, the prosecutor introduced the complainants by saying:

" '[M] is the oldest, [E] is the next, boy. They've grown so much over the course of the year since this case came to light.

. . . .

" 'Jennifer is mild. She is polished. She is articulate. She's well put together. She manages these kids with a calm competence that is amazing.'

"Akins asserts that these prosecutorial comments showed her inappropriate personal attachment to the complainants. He argues that the prosecutor then improperly vouched for their credibility during closing arguments:

" 'Each of these girls with their own take on it, with their own point of view, so no embellishment. *Yes, they are credible.* They are not tainted or they have not been poisoned by the suggestibility that the expert is trying to get you to buy.
. . . .

" '[J] is a motor mouth, vomit of information of how many times he was pinching her nipples and where and when and by description, demonstration and by noise. *Yes, that's credible. Such detail.'* (Emphasis added.)

"Finally, Akins argues that during closing arguments the prosecutor also improperly expressed her personal opinion that his testimony was false.

" 'The defense said it didn't happen at all. Do you buy that? View the volume of sexual contact and the physical evidence that you have here. Was it just accidental? Was he just messing around ... and this is all just a strange misunderstanding? *Not a chance on these facts.* His denials. I never touched those kids in a sexual way. *His statements I never touched those kids in a sexual way are not credible.' "* 298 Kan. at 606-07.

In response to Akins' challenge, the State argued that the prosecutor merely offered the jury an explanation of what it should look for in assessing credibility. The State further argued that the prosecutor's comments were properly accompanied by a discussion of the evidence, and the prosecutor simply pointed out permissible inferences the jury could make from the evidence. This court rejected the State's arguments. 298 Kan. at 607.

In holding that the statements constituted prosecutorial misconduct, this court looked at the statements in context and concluded that the prosecutor "directly, and improperly, expressed her personal opinion on the credibility of her own witnesses." 298 Kan. at 607. The court explained:

"In the context of this particular closing argument, we do not consider this to be a mere contention that based on the evidence presented the jury should infer facts about the girls' credibility. [Citation omitted.] While the prosecutor arguably makes such a contention regarding J because of 'such detail' that J provided, the prosecutor reiterates her opinion about this complainant's veracity with virtually identical, troubling language: 'Yes, that's credible.' [Citations omitted.]" 298 Kan. at 608.

In respect to the prosecutor's comments about Akins, this court held that the "comments essentially informed the jury that Akins could not be believed." 298 Kan. at 608. The prosecutor "did not point out inconsistencies in [Akins'] testimony or argue that specific evidence showed his statements were unworthy of belief." Instead, she "unabashedly opined about his veracity." 298 Kan. at 608.

Here, Todd has carved out a portion of a single sentence that was part of a larger discussion of the factors the jury could assess when determining witness credibility. Near the end of closing argument, the prosecutor informed the jury that it could "find from the evidence" that Horton's testimony was not credible. The prosecutor discussed Horton's bias and criminal record, *i.e.*, specific evidence from which he could argue permissible inferences. The prosecutor had exposed Horton's potential for bias based on her family relationship to Todd during cross-examination, and the prosecutor properly argued that point in closing. The prosecutor then stated:

"She was trying to help Loviss Todd, *she was not credible* and you can discount her testimony completely . . . ." (Emphasis added.)

The excerpted statement that Todd identifies as misconduct, *i.e.*, "she was not credible," was a reasonable inference that the prosecutor could argue based on Horton's family relationship with Todd, *i.e.*, her bias, and her criminal record. Read in context, it was not misconduct.

The prosecutor's additional statement that Horton "would have preferred to deceive you about her own criminal history" was based on Horton's question to the judge on whether she had to explain why she had been on probation. Todd argues that Horton's question "could at most be characterized as a reluctance to disclose [and] did not mean that she wanted to deceive the jury." We agree that the prosecutor's argument on this point was close to the outer limit of the wide latitude we allow in discussion of the evidence. But the inference it suggests was a permissible, if harsh, one. A jury is permitted to consider the demeanor of a witness, as well as his or her words. And a prosecutor may remind jurors about a witness' demeanor when the prosecutor is making a closing argu-

ment. See *Scaife*, 286 Kan. at 624 (prosecutor permitted to inform jury it may consider demeanor when assessing credibility).

Todd next argues that the prosecutor's comment about Horton's preference for deceit improperly distracted the jury from its role as factfinder and inflamed jurors' passions and prejudices. See *State v. Raskie*, 293 Kan. 906, Syl. ¶ 3, 269 P.3d 1268 (2012). We do not agree. The role of factfinder includes evaluation of witness credibility. And, again, jury assessment of credibility can be based on what factfinders see as well as what they hear, and the natural and logical inferences that flow from both of these sensory inputs.

Todd's final prosecutorial misconduct argument is that the prosecutor shifted the burden of proof to the defense when he commented about the fact that Horton had not gone to the police in the 2½ years between the time Todd was charged and the start of the Todd's trial. Todd characterizes these statements as the prosecutor asserting that Todd failed to provide corroboration for Horton's testimony. We see these remarks differently. They merely informed the jury that it could consider Horton's conduct as part of its evaluation of her credibility, which is a correct statement of Kansas law. The prosecutor certainly was permitted to poke holes in the defense's alibi theory during cross-examination, and, by extension, during closing argument. See *Wells*, 297 Kan. at 752. These comments by the prosecutor did not shift the burden to Todd and did not constitute misconduct.

## CUMULATIVE ERROR

The doctrine of cumulative error may require reversal when more than one trial error occurs and, taken together, they render the proceeding fundamentally unfair.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009)." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

The only two errors we have detected in this case are failure to give an accomplice witness cautionary instruction and inclusion of

the degree of certainty factor in the eyewitness identification instruction. Neither was reversible on its own as clear error. Given the mountain of evidence against Todd and the persuasive impeachment of his alibi defense, even when the two errors are considered together under the cumulative error doctrine, they do not necessitate reversal. Todd was not entitled to a perfect trial, *Cruz*, 297 Kan. at 1075, and he received a fair one.

## LIFETIME POSTRELEASE SUPERVISION

Todd also challenges the portion of his life sentence ordering lifetime postrelease supervision. The State concedes that this portion of Todd's sentence must be vacated. See *Wells*, 297 Kan. at 762; *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011) (inmate with off-grid indeterminate life sentence can leave prison only if successor to Kansas Parole Board grants parole; sentencing court has no authority to order any term of postrelease supervision in conjunction with off-grid indeterminate life sentence).

We therefore order the lifetime postrelease portion of Todd's life sentence be vacated.

## CONCLUSION

Todd's convictions are affirmed. His sentence is affirmed with the exception of the provision ordering lifetime postrelease supervision, which is vacated.