IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,905

STATE OF KANSAS,
*Appellee*,

v.

GABRIEL DE LA TORRE,
*Appellant*.

SYLLABUS BY THE COURT

1.

When jury unanimity is at issue, there are three sequential questions presented. The first is whether the appellate court is presented with a multiple acts case, *i.e.*, whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. This determination is a question of law over which an appellate court exercises unlimited review.

2.

After determining on appeal that a case is a multiple acts case, the appellate court must next determine whether error was committed. In multiple acts cases, either the State must have informed the jury which act to rely upon in its deliberations or the court must have instructed the jury to agree on the specific criminal act for each charge. The failure to elect or instruct is error.

3.

In a multiple acts case, when the State has not informed the jury which act to rely on in its deliberations and the trial court has failed to instruct the jury to agree on a specific criminal act for each charge, there is error and on appeal the appellate court must then determine whether the error warrants reversal or was harmless. The test for harmlessness when a unanimity instruction was not requested or its absence not objected to is the clearly erroneous standard provided in K.S.A. 2013 Supp. 22-3414(3).

4.

Criminal acts are multiple acts if they are factually separate and distinct. Incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a criminal act is motivated by a fresh impulse. Factually separate and distinct incidents are not unitary conduct.

5.

Even if a defendant generally denies criminal conduct, if there is no unified defense in a case, and the trial is not merely a credibility contest between the victim and the defendant, a multiple acts error may be reversible.

6.

The 2013 amendments made in K.S.A. 2013 Supp. 21-5402(d) and (e) eliminate lesser included offenses of felony murder and expressly provide for retroactive application of those provisions to cases pending on appeal on and after its effective date.

7.

Abuse of a child under K.S.A. 21-3609, which defines the crime as "intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel

2

and inhuman corporate punishment upon any child under the age of 18 years," does not create an alternative means crime.

8.

A prosecutor crosses the line of appropriate argument by making statements intended to inflame a jury's passions or prejudices or to divert the jurors' attention from their duty to decide a case on the evidence and controlling law.

9.

It is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, including the defendant. Nevertheless, a prosecutor has freedom to craft an argument that includes reasonable inferences based on the evidence and, when a case turns on which version of two conflicting stories is true, to argue that the evidence demonstrates certain testimony is not believable.

Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed August 15, 2014. Affirmed in part, reversed in part, and remanded.

*Corrine E. Johnson*, of the Kansas Appellate Defender office, argued the cause, and *Lydia Krebs*, of the same office, was with her on the brief for appellant.

*J. Scott James*, assistant county attorney, argued the cause, and *Kevin Salzman*, assistant county attorney, *Natalie K. Randall*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  Gabriel De La Torre appeals from his convictions of one count of abuse of a child and one count of felony murder, arising from the death of an 11-month-old

child who was in De La Torre's care. There were two trials because the first jury, which convicted De La Torre on the child abuse charge, could not reach a unanimous verdict on the felony-murder charge. The second jury trial resulted in his conviction of felony murder. De La Torre raises several issues relating to each trial and one sentencing issue.

As to the first trial, De La Torre argues his abuse of a child conviction must be reversed because: (1) The district court failed to give a unanimity instruction despite evidence of multiple acts; (2) there was insufficient evidence to support the conviction; and (3) there was prosecutorial misconduct. The State concedes evidence of multiple acts was presented but argues the failure to give a unanimity instruction does not require reversal because De La Torre presented a unified defense. We disagree with the State on the latter point. We hold De La Torre did not present a unified defense to the child abuse charge and the failure to give a unanimity instruction was clearly erroneous. De La Torre's conviction for child abuse is reversed. This outcome renders the remaining issues from the first trial moot, including the sentencing issue.

As to the second trial, De La Torre argues his felony-murder conviction should be reversed because: (1) The district court erred in failing to instruct the jury on the lesser included offense of reckless second-degree murder; (2) there was insufficient evidence to support the conviction; and (3) the prosecutor committed misconduct. We hold the first two issues are without merit. As to the third, we agree there was prosecutorial misconduct but hold it does not require reversal. We affirm the felony-murder conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2009, De La Torre brought 11-month-old Joselyn Hernandez to the emergency room at a Dodge City hospital. Joselyn was wet, pale, not taking deep or frequent-enough breaths, and had a low body temperature. Dr. Ben Short, the emergency

room physician, observed Joselyn's eyes were partially rolled up into her upper eyelids and her pupils were nonresponsive, indicating brain injury due to trauma or lack of oxygen. Joselyn was put on a helicopter bound for Wichita's Wesley Medical Center. The helicopter returned about 5 minutes after departure because Joselyn's condition had worsened. Short continued treatment of Joselyn for about 45 minutes until he pronounced Joselyn dead.

A Dodge City police corporal and an officer were dispatched to the emergency room. Using a hospital janitor as an interpreter, De La Torre spoke with emergency room doctors about what happened while the officers listened. The officers understood De La Torre to say he had given Joselyn a bath and was carrying her into a bedroom when he collided with a bed and fell, landing on Joselyn. De La Torre said Joselyn appeared to stop breathing or was struggling with her breathing, so he attempted to give her rescue breaths.

Before the helicopter departed the police obtained De La Torre's permission to photograph the infant and the house where the incident occurred. While at the house, before learning Joselyn had died, De La Torre told the corporal he had been standing with her, turned and hit the corner of the bed, fell between the bed and the dresser, and heard the infant gasp for air.

A Dodge City police detective also investigated. He observed bruises on Joselyn's forehead, cheeks, the back of her head, under her left ear, and on her body—including under her right armpit, on her right arm, and on her left lower leg. He also saw small lacerations to Joselyn's forehead and under her chin. The detective spoke to De La Torre at the hospital. De La Torre told the detective he was working outside and noticed Joselyn was tired. He said he gave Joselyn a bath to help her fall asleep and while

5

carrying her into the bedroom afterward he tripped over a blanket and fell directly onto the floor without hitting any furniture.

An autopsy revealed Joselyn's death was caused by blunt trauma to the chest that tore her heart's septum and caused the pericardial sac to fill with blood. It also revealed a number of bruises on Joselyn's face and in her scalp. The medical examiner testified these bruises ranged in age from a few hours to a week or 10 days old.

Nine days after Joselyn died, De La Torre consented to an interview with the detective. During this interview, De La Torre denied ever seeing anyone hit or harm Joselyn and denied seeing Joselyn bang her head, although he said he had seen her fall on her bottom. De La Torre also said approximately 4 days before Joselyn died, she fell off the couch and hit her head, causing a bruise on the left or right side. But De La Torre had no explanation for the child's other bruises, despite admitting he was the only person who watched her.

Lorena Hernandez, Joselyn's mother, said the only bruise she had seen on Joselyn's head was on the left side approximately 1 1/2 weeks before Joselyn died. When an investigator told her Joselyn had over 44 bruises on her scalp, Lorena "became extremely distraught and started crying."

The State charged De La Torre with abuse of a child and felony murder with the underlying felony of child abuse. See K.S.A. 21-3609 (child abuse); K.S.A. 21-3401(b) (felony murder). The State alleged the child abuse occurred between August 15, 2009, and September 6, 2009.

In the first trial, the jury convicted De La Torre of abuse of a child but could not reach a verdict on the felony-murder charge. Based on this deadlock, the district court

declared a mistrial on that charge. In the second trial, the new jury convicted De La Torre of felony murder. The trials had virtually complete factual overlap.

## UNANIMITY INSTRUCTION ON THE ABUSE OF A CHILD CHARGE

In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Foster*, 290 Kan. 696, 712, 233 P.3d 265 (2010); *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). This creates the potential for uncertainty as to whether the jury unanimously agreed on a particular act underlying each specific charge. See *State v. Voyles*, 284 Kan. 239, 248, 160 P.3d 794 (2007).

De La Torre argues his right to a unanimous jury verdict was violated because the district court failed to give a unanimity instruction, *i.e.*, the jury was not told to unanimously agree on the specific act underlying the child abuse conviction. He claims the State presented evidence at the first trial that he committed multiple acts of child abuse that were alleged to have occurred over a 3-week period. He further notes that, in addition to the district court not giving a special unanimity instruction, the State failed to elect a specific instance of abuse on which it relied to support the abuse of a child charge.

The State agrees its evidence presented a potential multiple acts case but attempts to salvage the conviction by arguing failure to give a unanimity instruction was not reversible error because De La Torre presented a unified defense by denying criminal responsibility for any of Joselyn's injuries. De La Torre acknowledges he did not request a unanimity instruction.

*Standard of Review*

Unanimity instruction errors are reviewed under a three-part framework. First, the reviewing court determines whether a multiple acts case is presented. The threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. *State v. King*, 299 Kan. 372, Syl. ¶ 1, 323 P.3d 1277 (2014). This is a question of law subject to unlimited review. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014) (citing *Voyles*, 284 Kan. at 244). If the case is a multiple acts case, the next question is whether error was committed. To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge. Failure to elect or instruct is error. Finally, the court determines whether the error was reversible or harmless. *Santos-Vega*, 299 Kan. at 18. When, as here, the defendant failed to request a unanimity instruction, the court applies the clearly erroneous standard provided in K.S.A. 2013 Supp. 22-3414(3). See *Voyles*, 284 Kan. at 252-53. Under this test, to find the error harmless:

> "[A]n appellate court must be firmly convinced that under the facts the jury would have returned a different verdict if the unanimity instruction had been given. See *State v. King*, 297 Kan. 955, 979-80, 305 P.3d 641 (2013); see also *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (noting court's decision to omit the 'real possibility' language from *Voyles* test to avoid confusion with the constitutional harmless error test)." *Santos-Vega*, 299 Kan. at 18.

*Additional Facts*

Besides the evidence already discussed, the State elicited testimony in the first trial from Dr. Jaime Oeberst that, in addition to the fatal injury to Joselyn's heart, Joselyn had multiple bruises on her scalp and face, some of which predated her death by up to 10

8

days. When asked if she had formed an opinion about how the bruises would have been inflicted on Joselyn's head, Oeberst said, "Separate episodes of blunt force injury." She also said the injury did not appear to be accidental. In explaining this, Oeberst said:

"Again, some of it is common sense. Some of it is just experience and training. It's not the usual course of affairs to have 35 bruises on a child's head. *And, there is no explanation and nothing offered in the circumstances surrounding [Joselyn's] death that could explain this number of injuries.* And, then, also, they're not just in one location or one [plane]. So, if you have a fall, you would expect that you're gonna have—you know you're gonna bump one part of your head. You're not gonna bump all four sides of your head. *So, it's inconsistent with a single episode of trauma.*" (Emphasis added.)

Lorena testified De La Torre watched Joselyn while she was at work. She said she never hit Joselyn nor saw her children, De La Torre's children, or Joselyn's former daycare provider hit Joselyn. She did testify Joselyn always had bruises on her cheeks because De La Torre's son would often grab them. She also said she noticed a knot on Joselyn's head, like a small ball, before she left for work on the day Joselyn died.

De La Torre testified he was outside fixing a fence on the day Joselyn died and she was with him. He went in to take a shower and put Joselyn to bed. He gave her a bath and then went into the bedroom. He said he stepped on a comforter with his right foot and his left foot got stuck, causing him to fall on top of Joselyn. He heard "the air come out" of Joselyn and heard her head hit the floor. He started giving Joselyn rescue breaths and touching her face and head. Joselyn began breathing again so he put her diaper and clothes on and took her to the hospital. He said Joselyn stopped breathing on the way, but he was able to revive her by repositioning her head and administering more rescue breaths.

9

Wilson Hayes, Ph.D., a biomechanics expert, testified as a prosecution witness. He concluded De La Torre could not have tripped and fallen on Joselyn in the manner De La Torre described. Hayes testified De La Torre would have fallen on or into furniture within the room instead of flat on the floor. He also testified that reflexive reactions normally experienced by falling people would have reduced the force generated by the fall to less than that required to cause the tear in Joselyn's heart. He said that injury could have been produced by a fist into the abdomen, kicks, stomps, compression of Joselyn's chest, or compression of her abdomen. He further testified De La Torre possessed sufficient physical strength to cause Joselyn's injuries.

*Discussion*

We must first decide whether this is a multiple acts case, which is a question of law. We are guided—but not bound by—the State's concession on this point. In a multiple acts analysis, a court must decide whether the defendant's conduct is part of one act or multiple acts that are separate and distinct from each other. *Voyles*, 284 Kan. at 244 (quoting *State v. Kesselring*, 279 Kan. 671, 682, 112 P.3d 175 [2005]). "Multiple acts" are legally and factually separate incidents that independently satisfy the elements of the charged offense. See *King*, 299 Kan. at 379; *State v. Soto*, 299 Kan. 102, 111, 322 P.3d 334 (2014). Incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a criminal act is motivated by a fresh impulse. Factually separate and distinct incidents are not unitary conduct. *King*, 299 Kan. 372, Syl. ¶ 2.

"Courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues." *Foster*, 290 Kan. at 713. And it has been noted that a multiple acts problem may arise even when the factual details about the multiple incidents are indefinite as to precisely when each occurred or even how many

10

acts occurred. See Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 323-25 (2005) (discussing special issues posed by "generic evidence" cases, prevalent in child abuse cases, in which witnesses to criminal conduct are incapable of specifically describing separate and distinct incidents); *cf. State v. Akins*, 298 Kan. 592, 596, 619, 315 P.3d 868 (2014) (in dicta, noting multiple acts of aggravated indecent solicitation; at trial, victim testified generically that defendant asked her to expose herself multiple times).

On the child abuse charge, the district court instructed the first jury that the State was required to prove:  (1) De La Torre "intentionally cruelly beat or inflicted cruel and inhuman bodily punishment upon Joselyn"; and (2) the abuse occurred "on or between August 15, 2009, and September 6, 2009 . . . ."

There was circumstantial evidence this crime occurred on more than one occasion during the time frame alleged by the State. Oeberst's testimony established separate blunt-force trauma episodes, some up to 10 days before Joselyn died. And Lorena's testimony placed De La Torre alone with Joselyn while Lorena was at work during that time and ruled out abuse by her, other members of the household, and others responsible for Joselyn's care. On the other hand, there was no direct testimony De La Torre ever hit Joselyn and no testimony tending to define specific, separate, identifiable acts of abuse. In other words, the State's evidence was generic but raised the inference that De La Torre "cruelly beat" or "inflicted cruel and inhuman bodily punishment" on Joselyn—*i.e.*, inflicted bruise-inducing wounds to her head and face on multiple, unspecified occasions between August 15 and September 6, 2009—and that he inflicted the injuries that killed her on September 6, 2009.

Although this is a close question, we are convinced the manner in which the State charged this crime—specifically, the wide time frame during which the alleged the abuse

occurred—coupled with the evidence, gives credence to the State's concession that this is a multiple acts case. And since there was no unanimity instruction given and the State did not elect a specific instance of abuse on which it relied to support the charge, we hold the district court erred. See *Santos-Vega*, 299 Kan. at 11, Syl. ¶ 3; *Voyles*, 284 Kan. at 244-45. But finding error is not enough. We must also decide whether the failure to give the instruction was clearly erroneous and, therefore, reversible.

The test applied is whether the court is "firmly convinced that under the facts the jury would have returned a different verdict if the unanimity instruction had been given." *Santos-Vega*, 299 Kan. at 18. "Kansas appellate courts have held a 'failure to instruct' in multiple acts cases to be reversible error except when the defendant presents a unified defense, *e.g.*, a general denial. If there is no unified defense, we do not tolerate verdict uncertainty in these cases." *Voyles*, 284 Kan. at 253; see also *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (after refining language of clearly erroneous test, court noted that it did "not discern a practical difference" between the *Voyles* formulation and the refined language).

The State argues the error is not reversible because De La Torre presented a unified defense that turned the case into a "credibility contest between the forensic evidence . . . and the Defendant's explanations of the accident." It contends the defense was unified because De La Torre claimed no abuse ever happened. We disagree.

Although De La Torre denied any criminal conduct, he did not present a unified, general denial defense as to all acts alleged. He presented a general denial as to the bruises on Joselyn's face and scalp, denying any wrongdoing and disclaiming any knowledge at all about how she sustained most of them. He also denied ever hitting Joselyn, and explained that perhaps she obtained some bruises by falling or because another child pinched her cheeks. And he presented testimony and argument that some

12

bruises on her face and head that appeared fresh the day Joselyn died arose from repositioning her head for mouth-to-mouth resuscitation in his efforts to revive her after the fall. But he did not deny involvement in Joselyn's death. His defense as to that incident was that he caused the fatal wounds—but did so accidentally.

Each juror in the first trial could have agreed on various permutations of whether De La Torre criminally inflicted the older bruises on Joselyn and whether he killed Joselyn—criminally or accidentally. Put another way, a jury might have rejected or accepted his innocent explanation for the fatal wounds he admitted inflicting on Joselyn but that would not be conclusive as to whether it would have rejected or accepted his general denial of involvement in causing Joselyn's other injuries.

De La Torre did not present a unified defense, so it is not enough to say the jury either believed De La Torre or did not. And the first jury reached a result that can be interpreted to indicate it was not unanimous as to whether it accepted De La Torre's explanation of the injuries that caused Joselyn's death when it found him guilty of child abuse between August 15 and September 6, while failing to reach a verdict on the felony-murder charge. Under these circumstances, we do not tolerate uncertainty. *Voyles*, 284 Kan. at 253.

We reverse De La Torre's abuse of a child conviction and remand that charge to the district court. This result makes it unnecessary to consider the other claims of error relating to the first trial, including the claimed sentencing error.

Moving to the second trial, De La Torre argues his felony-murder conviction must be reversed because: (1) The district court erred in failing to instruct the jury on the lesser included offense of reckless second-degree murder; (2) there was insufficient

13

evidence to support the conviction; and (3) the prosecutor committed misconduct. We consider those arguments next.

LESSER INCLUDED OFFENSE OF RECKLESS SECOND-DEGREE MURDER

De La Torre argues the district court erred when it failed to instruct the jury at his second felony-murder trial on the lesser included offense of reckless second-degree murder. This issue is without merit.

At the time of De La Torre's trial, Kansas law applied a judicially created lesser included offense rule in felony-murder cases in which lesser included offense instructions were necessary only when evidence of the underlying felony was weak, inconclusive, or conflicting. See *State v. Boone*, 277 Kan. 208, 219, 83 P.3d 195 (2004) (quoting *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 [2001]). In *State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011), the court abandoned this court-made "felony murder instruction rule." It held instead that the statutory mandate in K.S.A. 22-3414(3) governed the use of lesser included offense instructions in felony-murder cases. See 292 Kan. at 513 (holding lesser included offense instructions should issue in felony-murder cases if there is some evidence that would reasonably justify conviction of the lesser included crime). De La Torre's argument is based on *Berry*.

But in 2012 the legislature amended the criminal code to provide that there is no lesser degree—one type of lesser included offense—of felony murder. L. 2012, ch. 157, sec. 2 (codified at K.S.A. 2012 Supp. 21-5109). This court subsequently held the 2012 amendment would not apply retroactively to cases tried before the amendment. *State v. Wells*, 297 Kan. 741, 761, 305 P.3d 568 (2013). In response to that decision, the legislature amended the first-degree murder statute to provide that the elimination of

14

lesser included offenses for felony murder shall apply retroactively to all pending cases. L. 2013, ch. 96, sec. 2 (codified at K.S.A. 2013 Supp. 21-5402[d] and [e]).

In *State v. Todd*, 299 Kan. 263, 278-79, 323 P.3d 829 (2014), this court held the new retroactivity language both controls and withstands constitutional ex post facto challenges, preventing appellate argument that a district court erred in failing to instruct on any lesser included offenses of felony murder. *Todd* then held that because the amendment eliminating lesser degrees of felony murder was retroactive, a second-degree murder instruction would not have been legally appropriate, so the trial court did not err in failing to give one. *Todd*, 299 Kan. 279 (citing *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012]). Accordingly, De La Torre's lesser included offense argument fails.

INSUFFICIENT EVIDENCE TO SUPPORT THE FELONY-MURDER CONVICTION

De La Torre argues next that the evidence was insufficient to support his felony-murder conviction because the State failed to demonstrate during the second trial that he inflicted "cruel and inhuman corporal punishment." The question is essentially whether the phrase "cruel and inhuman corporal punishment" requires proof of defendant's specific intent to "punish" the child. And to support their divergent statutory interpretations to resolve this question in their favor, the parties argue at length whether K.S.A. 21-3609 (the abuse of a child statute) creates an alternative means crime. That issue is dispositive.

*Standard of Review*

The meaning of statutory language and the question whether a statute creates an alternative means crime are both issues of statutory interpretation subject to de novo review. See *State v. Garza*, 295 Kan. 326, 331, 286 P.3d 554 (2012); *State v. Brown*, 295

15

Kan. 181, 193-94, 284 P.3d 977 (2012) (whether statute creates alternative means is issue of statutory interpretation reviewable de novo on appeal).

*Additional Facts*

At De La Torre's second trial on the felony-murder charge, the district court instructed the jury that the State needed to prove De La Torre killed Joselyn while committing abuse of a child. It further instructed the jury that to prove abuse of a child, the State was required to show De La Torre "intentionally inflicted cruel and inhuman bodily punishment" on Joselyn.

As mentioned, the evidence presented at the second trial was nearly identical to that presented at the first trial. Short and Oeberst again testified, respectively, about Joselyn's emergency room condition and treatment and the injuries discovered during the autopsy. Hayes testified again that Joselyn could not have received her fatal injury in the fall De La Torre described and that De La Torre had sufficient strength to cause Joselyn's fatal injury. Oeberst's testimony was somewhat different as to the age of Joselyn's bruises. She testified:

> "Q. [Prosecutor]: Okay. So, some of these bruises could have come within a couple of hours?
> "A. [Oeberst]: Yes.
> "Q. And others within 24 hours?
> "A. For the most part. I think there was a couple that maybe had some little brown areas, and that kind of thing. So, they might have been a little bit older. But, the majority of them appear to be relatively of the same age."

Testifying again in his defense, De La Torre recounted the same explanation given at the first trial: that he fell on top of Joselyn after tripping on a comforter but knew

16

nothing about the other bruises and denied ever hitting Joselyn. De La Torre did elicit testimony when cross-examining Oeberst that a child who was awake when receiving the bruises Joselyn had on her body would cry. And he offered additional evidence in his defense—a detective's testimony that the defendant's children, who were home when Joselyn died, submitted to forensic interviews in which they denied "hearing anything" that day.

*Discussion*

On the date of Joselyn's death, the abuse of a child statute read:

"Abuse of a child is intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." K.S.A. 21-3609.

De La Torre argues the term "cruel and inhuman corporal punishment" differs from the other types of child abuse enumerated in the statute because it requires proof the defendant intended to discipline the victim; the jury was instructed it could convict De La Torre only upon concluding he inflicted cruel and inhuman corporal punishment on Joselyn; and the State presented no evidence he inflicted Joselyn's fatal wounds for disciplinary purposes. Under De La Torre's interpretation, abuse of a child by inflicting cruel and inhuman corporal punishment is a specific intent crime because it requires, "in addition to the nearly omnipresent general intent requirement," proof of "a further particular intent which must accompany the prohibited acts." *State v. Richardson*, 289 Kan. 118, 121, 209 P.3d 696 (2009) (quoting *State v. Cantrell*, 234 Kan. 426, Syl. ¶ 7, 673 P.2d 1147 [1983], *cert. denied* 469 U.S. 817 [1984]).

17

If this is correct, the statute necessarily sets out alternative means because abuse of a child accomplished by "torturing," "cruelly beating," or "shaking which results in great bodily harm" require no proof of the defendant's specific intent to discipline the victim. See, *e.g.*, *State v. Hupp*, 248 Kan. 644, 653, 809 P.2d 1027 (1991) (abuse of a child accomplished by hitting and hurting—intent to injure not an element). Accordingly, specific intent to discipline would be a material, distinct *mens rea* requirement, unique to the "cruel and inhuman corporal punishment" clause of the statute. See *Brown*, 295 Kan. at 194.

In support of his claim that the statute sets out alternative means of committing abuse of a child, De La Torre relies principally on language in *State v. Carr*, 265 Kan. 608, 963 P.2d 421 (1998), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). In *Carr*, the court affirmed a felony-murder conviction based on the underlying offense of abuse of a child. On appeal, the defendant argued the jury instructions violated her right to a unanimous jury verdict because they permitted the jury to convict her on proof "the defendant intentionally cruelly beat, inflicted cruel and inhuman bodily punishment upon, or shook [the child], which resulted in great bodily harm to [the child]." 265 Kan. at 616. She claimed some jurors might have alternately found she cruelly beat the child, while others found she intentionally inflicted cruel and inhuman bodily punishment, while still others found she shook the child.

The *Carr* court disagreed. It explained without analysis that "[t]he three methods outlined above by the defendant are alternative means by which child abuse may be committed," but "in this case, there was sufficient evidence for the jury to conclude that the defendant cruelly beat, inflicted cruel and inhuman bodily punishment on, and shook [the child]." 265 Kan. at 618.

18

But two things undercut *Carr*'s persuasive value. First, the case was decided before this court refined its alternative means analysis in *Brown*, 295 Kan. 181. Second, the alternative means language in *Carr* referenced by De La Torre is incidental to its holding that the defendant's right to jury unanimity was not undermined by evidence of multiple acts. *Carr* did not consider the possibility that the defendant's unanimity argument might not have presented either a multiple acts problem or an alternative means problem. See 265 Kan. at 618.

Under *Brown*, we explained that the legislature creates an alternative means crime when it defines a crime with two or more alternative, distinct, *mens rea*, *actus reus*, or causation elements. 295 Kan. at 199-200. Options within a means that do not state additional and distinct ways of committing the crime but rather describe a material element or a factual circumstance that proves the crime do not create alternative means. 295 Kan. at 196-97; see *State v. Cheffen*, 297 Kan. 689, 702, 303 P.3d 1261 (2013) (killing during attempt to commit, commission of, or flight from inherently dangerous felony not alternative means of committing felony murder but factual circumstances proving material element of engaging in inherently dangerous felony); *State v. Aguirre*, 296 Kan. 99, 108, 290 P.3d 612 (2012) ("preventing or dissuading" and "attempting to prevent or dissuade" victim from reporting crime not alternative means of committing aggravated intimidation of a victim).

In *State v. Ahrens*, 296 Kan. 151, 160, 290 P.3d 629 (2012), cited by the State, this court held that the legislature did not intend the words "operating" and "attempting to operate" to create alternative means in the Kansas driving under the influence statute, but rather to "encompass a broader set of factual circumstances that could establish the driving element." The court construed the statute to have two elements:  "(1) driving and (2) being under the influence, while the language following that phrase simply sets out the factual bases that will satisfy the elements of the crime." 296 Kan. at 161. For

19

support, the court cited a subsequent statutory amendment that added prefatory language to the statute stating that "[d]riving under the influence is operating or attempting to operate . . . ." 296 Kan. at 160-61.

The abuse of a child statute similarly lists various factual scenarios that suffice to prove the element of "abuse" rather than setting out alternative means of committing the offense. As in *Ahrens*, the legislature's recent amendments to the abuse of a child statute reinforce this view. The statute now reads:

> "(a) Abuse of a child is knowingly:
> (1) Torturing or cruelly beating any child under the age of 18 years;
> (2) shaking any child under the age of 18 years which results in great bodily harm to the child; or
> (3) inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." K.S.A. 2013 Supp. 21-5602.

This court's recent decision in *Cheffen* is also supportive. Relying in part on *Ahrens*, we held that "committing," "attempting to commit," and "fleeing from" an inherently dangerous felony are not alternative means of committing felony murder, reasoning:

> "The felony-murder statute has two primary elements—killing and simultaneously engaging in an inherently dangerous felony. The second element can be established through proof that the killing occurred while the defendant was committing, attempting to commit, or fleeing from an inherently dangerous felony. These are simply factual circumstances in which a material element may be proven. Therefore, this language in the felony-murder statute does not create alternative means . . . ." *Cheffen*, 297 Kan. at 702.

20

Applying *Brown* and *Ahrens*, the elements of abuse of a child set out in K.S.A. 21-3609 are (1) abusing; and (2) a child under 18 years old. And while we acknowledge that the current statute's subsection structure might cut toward applying an alternative means label at first blush, we nevertheless view these subsections as merely setting out examples of factual circumstances that could prove the actus reus. The types of abuse enumerated in the statute, such as "cruelly beating" and "cruel and inhuman corporal punishment," simply describe two factual circumstances that could satisfy the abuse element. K.S.A. 21-3609 does not define an alternative means crime.

This conclusion necessarily renders impossible De La Torre's interpretation of the phrase "cruel and inhuman corporal punishment." The legislature did not set out alternative sets of material elements of abuse of a child. It also did not intend this phrase to include a unique specific intent prerequisite not required to prove abuse under the other factual circumstances the statute describes. Our conclusion is further buttressed by the lack within the statute of words commonly used to signal specific intent crimes, such as "with intent to." See *Richardson*, 289 Kan. at 122-23.

Proof of intent to discipline was not necessary to make out a claim that De La Torre inflicted "cruel and inhuman corporal punishment" on Joselyn. De La Torre's argument that his convictions must be reversed for lack of evidence that he "inflicted [Joselyn's] injuries as a form of punishment" fails.

PROSECUTORIAL MISCONDUCT

De La Torre alleges four instances of prosecutorial misconduct at his second trial. We will consider each in turn, as well as any cumulative impact. It is important to recall the evidence at the second trial was virtually indistinguishable from the evidence at the first, except for some variation in the medical testimony about Joselyn's bruising. And

21

relevant to one misconduct claim, De La Torre testified he had been convicted of perjury and identity theft arising from signing a form with a name other than his own to obtain a job.

*Standard of Review*

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Prosecutors enjoy wide latitude in crafting closing arguments. *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (2001) (citing *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000]), *cert. denied* 534 U.S. 1047 (2001). This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. See *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011). Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met and on appellate review the court must consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. See *Bridges*, 297 Kan. at 1014-15.

Appellate courts consider three factors in analyzing the second step:  (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. But

none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013).

*The comment there were 30 bruises on Joselyn's head and body that "led to her death" was not improper.*

In opening statements the prosecutor said, "This is difficult evidence. Joselyn suffered over 30 bruises on her head and her body *that led to her death*." (Emphasis added.) De La Torre argues this constituted improper argument of facts not in evidence because the State did not present any proof the bruises on Joselyn's head were connected to her death. The State responds that the prosecutor was discussing the nature of the evidence—not affirmatively arguing those particular injuries actually caused the child's death. It also notes the manner of death was not a contested issue at trial.

Opening statements are given to assist the jury in understanding what each side expects the evidence will prove and to frame the questions the jury will have to decide. Misconduct occurs when the prosecutor strays outside "the wide latitude granted the prosecutor in stating facts he or she proposes to prove." See *State v. McCorkendale*, 267

23

Kan. 263, 277-78, 979 P.2d 1239 (1999), *disapproved on other grounds by State v. King*, 288 Kan. 333, 203 P.3d 585 (2009); see, *e.g.*, *State v. Alger*, 282 Kan. 297, 304, 306, 145 P.3d 12 (2006) (prosecutor did not cross "line between mere recitation of expected evidence and forbidden argument" when he said victim would "forever be two years old and her last memory will forever be that of the Defendant violently shaking the life out of her").

De La Torre is technically correct that Joselyn's head injuries were not causally related to her death; but this statement did not exceed the prosecutor's latitude to lay out the State's case for the jury. The bruises on Joselyn's head and body were important evidence that De La Torre killed Joselyn while abusing her, rather than her death being accidental. The statement also is seen as a sequential recitation of the evidence that these head injuries preceded the fatal injuries, such that the prosecutor's statement could be considered more about chronology than about medical causation. We hold the comment was not improper.

*The commentary about what Joselyn might have thought of the world was improper.*

Near the beginning of closing arguments at the second trial, the prosecutor said:

"Joselyn was 11 months old, just a toddler, not able to walk, certainly not able to talk. But, she could feel pain. But, she wasn't able to tell anyone about it.

"*I wonder what she must have thought this world was all about these last couple of days*." (Emphasis added.)

De La Torre argues the comments impermissibly encouraged the jury to create an imaginary script and speculate on facts not in evidence, *i.e.*, what Joselyn was thinking in the time immediately before she died. We agree.

24

"A prosecutor should not make statements intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and controlling law." *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2004). The prosecutor's observation that he personally wondered what Joselyn thought about the world during the period of alleged abuse crosses the line. This court has said it is improper for a prosecutor to refer to the victim's thoughts or create an "imaginary script" by putting words in the victim's mouth. See *State v. Kleypas*, 272 Kan. 894, 1113, 40 P.3d 139, *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004).

As De La Torre points out, there was no permissible reason to discuss what Joselyn might have thought "this world was all about" as a result of De La Torre's abuse. This commentary is not related to explaining why the conduct or testimony of a witness was consistent with the State's theory, nor did it have anything to do with De La Torre's guilt. It was intended to impermissibly inflame the jury's passions and prejudices in a similar fashion as "golden rule" arguments in which the prosecutor asks jurors to put themselves in the victim's place. See *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006) (recognizing general impropriety of "golden rule" arguments"). We hold the statement was improper commentary.

*Commentary that there was "no dispute" about the elements of felony murder was not improper.*

Just after the comment about what Joselyn must have thought the world was all about, the prosecutor said:

> "I want to go over the elements of the case which the State is asking you to find in this case in order to return a verdict of guilty.

25

"What the State has to prove beyond a reasonable doubt, but not beyond all doubt, just beyond a reasonable doubt, which is a burden we, of course, willingly and gladly accept, and it should be that way. One, that the Defendant killed [Joselyn]. I don't think there is any dispute about that. *Two, that such killing was done while in the commission of abuse of a child. I don't believe there is any dispute about that*. And, that this act occurred on or about the 6th day of September, 2009 in Ford County, Kansas. No dispute about that."

"Now, the elements of abuse of a child are you have to be able to find in order for it to be in the commission of the felony of child abuse, that the Defendant intentionally inflicted cruel and inhuman punishment upon [Joselyn], that [Joselyn] was a child under the age of 18 years, and, that this act occurred between the 15th day of August and the 6th day of September, 2009 in Ford County.

"So, let's look to—first, to the facts of the case." (Emphasis added.)

The prosecutor then went on to discuss the testimony of the State's witnesses and De La Torre's testimony. He concluded: "And, that's for you to determine, and that's what the State has asked you to determine, is to find that this was no accident, that this was a killing done in the commission of abuse of a child."

De La Torre argues the prosecutor impermissibly expressed a personal opinion about his guilt when the prosecutor told the jury he did not believe there was a dispute that De La Torre killed Joselyn in the commission of abuse of a child. The State argues the prosecutor was not saying that the fact Joselyn was killed in the commission of child abuse was undisputed; rather, it argues, the prosecutor was saying there was no dispute that it was an element the State had to prove. The State further argues De La Torre's interpretation is "nonsensical" because it was obvious there was "a furious dispute about

26

whether the evidence showed [Joselyn] was killed during an episode of child abuse [or accidently]".

A prosecutor may not state a personal opinion about a defendant's ultimate guilt or innocence. *State v. Peppers*, 294 Kan. 377, 399, 276 P.3d 148 (2012). But a prosecutor may argue the evidence demonstrates guilt. 294 Kan. at 399-400. "[T]his court has allowed a 'directional' statement by a prosecutor that can 'best be characterized' as serving 'as an opening for the prosecutor's upcoming summation of evidence.'" 294 Kan. at 399 (quoting *State v. Mann*, 274 Kan. 670, 689, 56 P.3d 212 [2002]). But these must be accompanied by additional statements "akin to 'the evidence shows defendant's guilt' in order to make a statement merely directional and not an expression of the prosecutor's personal opinion." 294 Kan. at 400.

The statement here occupies a middle ground between the impermissible opinion in *Peppers* and the permissible directional statement in *Mann*. It was made near the beginning of the prosecutor's remarks and did not explicitly include directional language cuing the jury that he would be offering reasons supporting the stated "belief" that there was no dispute the killing occurred "in the commission of abuse of a child." But after reciting the elements along with the objected-to comments, he directed the jury toward the facts, then discussed the evidence in the case at length, and bookended the statement with reminders about the State's burden of proof and the jury's role in assessing whether the State met that burden. He explained it was the State's burden to prove each element beyond a reasonable doubt, and he concluded after discussing the evidence that it was for the jury to determine whether the State had proven the element.

We hold the comment was not improper in the context of the argument that followed it.

27

*References to De La Torre's testimony being a "story" were improper.*

After recounting Hayes' testimony about the biomechanics of falling, the prosecutor said:

> "And, there is a reason the defendant didn't do any of those things [that Hayes testified people normally do when they fall], or couldn't explain any of those things, and the reason is that there was no fall. There was no accident. Had there been a fall, had [the defendant], in fact, tripped on the bedspread, which, the evidence would show there is serious, serious doubt as to whether that is true, had he indeed done that, then the laws of physics would have taken over, biomechanics would have taken over. Just as a cat flips up on its legs when it's upside down, just like you would take your hand off a hot stove, natural reaction, you would do everything you could to lower your center of gravity, take a recovery step, fall to your knees. And, in effect, you would create a zone of protection for whatever it was you were carrying, whether it be a glass vase, a glass of ice tea or a child. None of that was done by the Defendant, because it didn't happen.

> . . . .

> "That's just the *story*. You're hearing this *story* from an individual who has admitted to two crimes of dishonesty.

> "So, the fact is, one of the instructions is you have the power, the right to determine the truth and the credibility of witnesses, who is telling the truth and who is not. You can measure the—you have the evidence to measure the credibility of the Defendant's version of how Joselyn received the injuries that caused her death, or you have the evidence from Dr. Hayes and your own experience and common knowledge about how people fall." (Emphasis added.)

De La Torre argues the emphasized language was impermissible commentary about his credibility. We agree.

28

A prosecutor is forbidden from offering his or her personal opinion that the defendant's testimony is untruthful. *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014). The rationale for the rule "'is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case.'" *State v. Graham*, 277 Kan. 121, 128-29, 83 P.3d 143 (2004) (quoting *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]). The prohibition extends not only to using the word "lie," but to also to its "derivative." *State v. Elnicki*, 279 Kan. 47, 58-59, 62, 105 P.3d 1222 (2005) (prosecutor called defendant's testimony a "fabrication," "yarn," "final yarn," "fairy tale," "tall tale," "the yarn spun here," and "four-part yarn"); see also *Akins*, 298 Kan. at 607 (prosecutor asked if jury "bought" defendant's story and said his testimony was "not credible"). But prosecutors are permitted "to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility." *Akins*, 298 Kan. at 608; see *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (not improper commentary on credibility to identify specific evidence supporting wholly evidence-based argument victim's testimony was more believable than defendant's). The comments are considered in the context in which they were made, not in isolation. *Duong*, 292 Kan. at 831.

It is impossible to view the prosecutor's comments about De La Torre's "story" without it communicating by an impermissible euphemism that he was lying. Prosecutors simply may not do this. We hold the use of the characterization of his testimony as a "story" to be improper.

*The prosecutorial misconduct is not reversible error*

Having determined the prosecutor committed misconduct, we turn to the second step in our analysis, which consists of applying the three factors used to determine

29

whether the misconduct denied De La Torre a fair trial. First, we must determine if the misconduct was gross and flagrant. See *Bridges*, 297 Kan. at 1012. Often in examining this factor we assess whether the statement is contrary to a long-standing rule of law. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors determining gross and flagrant conduct include repeated comments, emphasis on improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right); see also *Bridges*, 297 Kan. at 1015-16 (prosecutor's conduct was gross and flagrant because it violated the well-established rule prohibiting comments on the defendant's credibility). Under the second factor, it must be determined whether the prosecutor's statement was a result of ill will. A prosecutor's ill will is often "'reflected through deliberate and repeated misconduct.'" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011) (quoting *State v. Madkins*, 42 Kan. App. 955, 961, 219 P.3d 831 [2009]).

We note the prosecutor's comments were repeated in substantially identical form in both the first and second trial. Therefore, they were deliberate and not the product of a "heat-of-the-moment" excuse. In addition, the prosecutor's comments violated long-standing rules against inflaming juror passions, consideration of irrelevant matters, and euphemisms regarding a defendant's credibility. Given these circumstances, we conclude the prosecutor's comments were gross and flagrant and motivated by ill will.

Lastly, we consider whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. The evidence in the second trial was strong that Joselyn's fatal injuries, sustained while De La Torre was caring for Joselyn, were not accidental. There was significant evidence of child abuse, along with expert testimony undercutting De La Torre's innocent explanation. We hold there is no reasonable possibility the prosecutor's

30

improper comments affected the trial's outcome. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).There is no reversible error.

Affirmed in part, reversed in part, and remanded.

MORITZ, J., not participating.

MICHAEL E. WARD, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Ward was appointed to hear case No. 107,905 vice Justice Moritz pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.