NOT DESIGNATED FOR PUBLICATION

No. 114,791

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

BRENT L. BURTON,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed November 18, 2016. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., POWELL, J., and STUTZMAN, S.J.

*Per Curiam*:  An amended complaint filed in September 2014 charged Brent Burton with two counts of child abuse or in the alternative, two counts of aggravated endangering a child. A jury found Burton guilty of all four counts—the principal and alternative charges. The district court entered judgment only on the two principal charges of abuse of a child and sentenced Burton to concurrent sentences of 36 months in prison for the primary offense and 32 months for the additional offense with 24 months of postrelease supervision. Burton's category H criminal history placed him in a border box on the revised Kansas Sentencing Guidelines Act nondrug sentencing grid. K.S.A. 2015 Supp. 21-6804. Although Burton's presumptive disposition was imprisonment, the district

1

judge imposed the optional nonprison sentence authorized by K.S.A. 2015 Supp. 21-6804(q) and granted Burton 36 months of probation supervised by community corrections.

Burton timely appeals, raising two issues: (1) the State failed to present sufficient evidence to support convictions for child abuse or in the alternative, aggravated endangering a child; and (2) there was not substantial evidence supporting all of the alternative means of committing the crime of aggravated endangering a child, violating his right to a unanimous jury verdict on those counts. We need not consider the second of those issues, since the district court only entered judgment on the verdicts for abuse of a child, making moot any consideration of the verdicts on the alternative charges. On the one issue to be considered, we find no support for Burton's claims and affirm the convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

Five-year-old T.T.B., and his 2-year-old sister, A.R.B., lived with their father, Brent Burton, in Hutchinson, Kansas. Also living in the home were Burton's girlfriend, Remay Barban, and her two children. On a Monday in early May 2014, T.T.B.'s preschool teacher, Lori Johnson, noticed unusual bruising on T.T.B. T.T.B. was wearing shorts and was sitting when Johnson observed dark bruises on his legs. Johnson said the bruises were big, not "small bruises like you would see if . . . they were a play bruise of some kind." Johnson took T.T.B. to see the school nurse and both Johnson and the nurse examined T.T.B.'s bruises.

Under the usual protocol, Johnson would have called the Department for Children and Families (DCF) to make a report, but in this case she believed T.T.B. was in danger and more immediate action was needed. As a mandated reporter, Johnson went to the

2

principal's office and explained she believed this was a time when they needed to contact the police to investigate. Johnson said that in her 13 years of teaching, she had never seen such severe bruising on a child.

Officer Nic Smith of the Hutchinson Police Department responded to Lincoln Elementary School to investigate the report involving T.T.B. When he arrived he met with Johnson and the school nurse. He had T.T.B. raise his shorts so that he could examine the bruising on his legs. Smith saw bruises going up to the bottom of T.T.B.'s underwear lining and took photographs of the bruising. He then placed T.T.B. in police protective custody. Meanwhile, another officer was sent to A.R.B.'s daycare. The officers decided to place A.R.B. in protective custody based on T.T.B.'s injuries. Smith took additional photographs of T.T.B. during intake for protective custody. Those photographs showed bruising on T.T.B.'s bare buttocks.

When Burton went to pick his son up from school he was told that T.T.B. had been taken into police protective custody. Smith asked him about the bruising. Burton first said he did not know anything about it, but then said T.T.B. got in trouble over the weekend and he was spanked four or five times. Burton referred to the spanks as "good whacks."

Detective Paul Sack of the Juvenile Detective Bureau in the Hutchinson Police Department was assigned to the case. He reviewed the photographs Smith took of T.T.B. He also went to Children's Emergency Shelter Home, examined A.R.B., and took photographs of her injuries, which Sack said showed bruising on A.R.B.'s buttocks and lower back.

Sack interviewed Burton about the injuries. Burton said his girlfriend, Barban, was at work and he was at home with both his and her children. Barban's children went down the street to play with friends. Burton said that between 11 a.m. and noon he had fallen

3

asleep on the couch and when he woke up, he discovered T.T.B. and A.R.B. were no longer in the house. When he could not find the children in the residence he went outside and down the block. He found T.T.B. and A.R.B. at a park near their home. Burton said he took the children home, asked them what they did wrong, spanked them, and sent them to their rooms until dinnertime. Burton said he bent them over his knee and used his bare hand to spank their buttocks area.

Sack quoted Burton in his report. Burton told him, "I admit I probably added to the bruising"; "I put [T.T.B.] over my knee and gave him a few good swats"; and "I might have tagged him on the left side." When explaining what he meant by adding to the bruising, Burton said T.T.B. had fallen onto a tree stump at the end of April, and had fallen coming out of a restroom facility at the beginning of May. In the opinion of Sack, who was trained in the investigation of child abuse and domestic violence cases, T.T.B.'s injuries were not consistent with the accidents Burton described. Sack said the injuries on the children would cause him enough concern to investigate the situation and consider reporting. He observed "bruising on different areas," he said there "appear[ed] to be the after[]effects of a severe sunburn possibly, and then maybe some small contusions." He also observed "a mark on the upper lip which appeared to be scabbed over and another spot on the body which appeared to be scabbed over."

Sack and the DCF social worker also interviewed Barban. Barban said she was at work when the injuries occurred. When she came home, Burton told her he spanked the children because they left the residence without permission. Barban told Sack the children had received spankings in the past, generally done with a hand. She also said, however, that the children had been spanked with a belt in the past. Barban told Sack that it had been a few months since the belt was used on the children and that it was used as a last resort when other disciplinary practices were unsuccessful. Barban said T.T.B. normally received "about four or five swats on the buttock" and A.R.B. received "one or two swats." Sack described both Burton and Barban as cooperative.

4

Burton's case went before a jury in August 2015. The State presented evidence from T.T.B.'s preschool teacher, Lori Johnson, Officer Smith, and Detective Sack. The evidence included photos taken by police of the bruising on T.T.B.'s forearm, buttocks, and mid-thighs, and the bruising on A.R.B.'s buttocks.

The State also called Barban to testify. She said she and Burton had married in July 2014. Consistent with what she had told Sack, she testified that when she came home from work the day of the incident, Burton told her he spanked the kids for leaving the house. Prior to the incident, Barban did not remember seeing any bruises on the children, including when she had bathed them. She also said T.T.B. bathed on his own. Barban further stated that she dressed A.R.B. that morning, and T.T.B. dressed himself. She said she was unaware of any of T.T.B.'s falls that Burton had mentioned. Barban said she believed in spanking as a form of discipline, that the spankings generally were done with a hand, and that she had not caused any of the bruises.

Burton chose not to present evidence.

ANALYSIS

As his single issue for our consideration, Burton claims the State failed to present sufficient evidence to support the jury's convictions. Although he frames that issue as a challenge to the sufficiency of the evidence to support his convictions, his argument does not focus directly on how the evidence the State presented lined up against the elements it needed to prove. Instead, Burton argues the State was obligated to prove his actions were both "cruel" and "inhuman" within dictionary definitions that he suggested. We will review the claims he argues in his brief, as well as the claim he presents in his statement of the issue.

5

The State charged Burton with two counts of abuse of a child, one each for T.T.B. and A.R.B., alleging that he "feloniously and knowingly inflict[ed] cruel and inhuman corporal punishment upon . . . a child under 18 years of age." Based on the conjunctive "and" in the statute and in the instruction given to the jury on these charges, Burton argues, without supporting authority, that the State was obliged to prove beyond a reasonable doubt that his actions were both cruel and inhuman. As those terms are not defined statutorily, Burton supplies dictionary definitions to be used to fill that gap as benchmarks to measure the State's evidence, presumably for sufficiency.

In *State v. De La Torre*, 300 Kan. 591, 331 P.3d 815, *cert. denied,* 135 S. Ct. 728 (2014), the defendant was convicted of felony murder based on the abuse of a child. In that case, the defendant argued the State presented insufficient evidence to support the charge that he inflicted "cruel and inhuman corporal punishment." The thrust of his argument was that the evidence did not show he had a specific intent to punish the child. The phrase "cruel and inhuman corporal punishment," contained in K.S.A. 21-3609, which was the version of the statute applicable to De La Torre's case, remains intact in the successor version of the statute, specifically at K.S.A. 2015 Supp. 21-5602(a)(3), upon which Burton's convictions were based. In *De La Torre*, both the defendant and the State argued their issue using an alternative means analysis, which the court found to be dispositive. 300 Kan. at 602.

Burton does not argue the State failed to show he intended to punish T.T.B. and A.R.B. In fact, in his statement to police he suggested that recent punishment may have acted cumulatively with past accidents to cause T.T.B.'s bruises. And Burton does not contend cruel and inhuman are alternative means, requiring substantial evidence of each—instead, he maintains they are *separate* qualities of a defendant's acts, but conviction requires proof of *both* beyond a reasonable doubt. These differences notwithstanding, the alternative means analysis in *De La Torre* is still instructive for interpretation of the statute to consider Burton's argument.

"The meaning of statutory language and the question whether a statute creates an alternative means crime are both issues of statutory interpretation subject to de novo review." 300 Kan. at 602. Our Supreme Court has established the manner for identifying alternative means statutes:

"Under [*State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012)], we explained that the legislature creates an alternative means crime when it defines a crime with two or more alternative, distinct, *mens rea, actus reus,* or causation elements. 295 Kan. at 199-200. Options within a means that do not state additional and distinct ways of committing the crime but rather describe a material element or a factual circumstance that proves the crime do not create alternative means. [Citations omitted]." 300 Kan. at 605.

The *De La Torre* court looked to *State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012) for an application of the method. In *Ahrens*, the court held that the legislature did not intend to create alternative means in the driving under the influence statute when it used the terms "operate" or "attempt to operate." They explained it this way: "The crime of driving under the influence requires two primary elements—that is, driving and simultaneously being under the influence." 296 Kan. at 160.

The court in *De La Torre* applied *Brown* and *Ahrens* to abuse of a child, holding:

"[T]he elements of abuse of a child set out in K.S.A. 21-3609 are (1) abusing; and (2) a child under 18 years old. And while we acknowledge that the current statute's subsection structure might cut toward applying an alternative means label at first blush, we nevertheless view these subsections as merely setting out examples of factual circumstances that could prove the actus reus. The types of abuse enumerated in the statute, such as 'cruelly beating' and 'cruel and inhuman corporal punishment,' simply describe two factual circumstances that could satisfy the abuse element. K.S.A. 21-3609 does not define an alternative means crime." *De La Torre*, 300 Kan. at 607.

7

The current version of the abuse of a child statute, K.S.A. 2015 Supp. 21-5602, reads:

"(a) Abuse of a child is knowingly:

(1) Torturing or cruelly beating any child under the age of 18 years;

(2) shaking any child under the age of 18 years which results in great bodily harm to the child; or

(3) inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years.

"(b) Abuse of a child is a severity level 5, person felony.

"(c) A person who violates the provisions of this section may also be prosecuted for, convicted of, and punished for any form of battery or homicide."

The statute has not changed in any way that would alter the *De La Torre* analysis. That court held that its reasoning "renders impossible De La Torre's interpretation of the phrase 'cruel and inhuman corporal punishment.'" 300 Kan. at 607. The elements of abuse of a child remain, simply: abuse, and a child under 18 years old. De La Torre could not infer a specific intent that the legislature had not clearly intended. In the same way, Burton cannot create unintended elements of the crime. "Cruel" and "inhuman" are not separate elements, each to be proven, but are part of one of the factual circumstances that can prove the actus reus. In the same way that the statute should not be deconstructed into alternative means, it should not be reconstructed to create elements not intended by the legislature. Guided by *Brown*, *Ahrens*, and *De La Torre*, we find the legislature intended "cruel and inhuman" to be a modifier describing a level of corporal punishment that constitutes abuse.

In his brief, Burton reaches for the dictionary to define the type of behavior that he asserts should have been required to show he was both cruel and inhuman in his actions. Another panel of this court has considered a similar argument in an appeal from a conviction for abuse of a child. In that case, the defendant claimed "the evidence was

8

insufficient to find that she intentionally inflicted 'cruel' or 'inhuman' punishment based on case law and dictionary definitions of those terms." *State v. Thompson-Dupes*, No. 102,405, 2011 WL 867581, at *4 (Kan. App. 2011) (unpublished opinion). That panel rejected the attempt to further define the statutory terms:

> "More pertinent is the ruling in *State v. Fahy,* 201 Kan. 366, 370, 440 P.2d 566 (1968), where our Supreme Court rejected a defendant's claim that K.S.A.1967 Supp. 38-714—a predecessor to K.S.A. 21-3609—was unconstitutionally vague and indefinite. That statute provided, in pertinent part:
> "'"Any person who shall torture, cruelly beat or abuse any child under the age of sixteen (16) years or who shall willfully inflict upon such child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition shall be deemed guilty of a felony. . . ."'*Fahy,* 201 Kan. at 370.
> "Our Supreme Court found 'such words as torture, beat, abuse, cruel punishment or inhuman punishment are hardly vague.' 201 Kan. at 370. Rather, the court held that 'words like "beat," "abuse," "torture," "cruelty" and "traumatic" provide' reasonable definite standards which one reading the statute can understand and contemplate. 201 Kan. at 370.
> "Thus, in the context of a crime charged such as this, the determination of cruelty and inhumanity becomes one for the jury. These words are not overbroad and they have common meanings." 2011 WL 867581, at *5.

We agree that the terms cruel and inhuman provide reasonable and definite standards, and common meanings that can be understood and contemplated by a jury.

We now move to the sufficiency issue that was nominally presented by Burton, although without elaboration or support. When the sufficiency of the evidence is challenged in a criminal case, this court reviews all the evidence in the light most favorable to the prosecution and must be convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In determining whether there is sufficient evidence to support a conviction, the appellate courts generally will not

reweigh the evidence or make witness credibility determinations. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

A verdict may be supported by circumstantial evidence if such evidence provides a basis from which the factfinder may reasonably infer the existence of the fact in issue. However, the evidence need not exclude every other reasonable conclusion or inference. A conviction of even the gravest offense can be based on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Furthermore, to the extent this court must engage in statutory interpretation, review is unlimited. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014).

Burton argues at length that the State's evidence was insufficient to show spanking with a bare hand was cruel and inhuman and that he knowingly inflicted cruel and inhuman corporal punishment. The State presented the witnesses noted above with their testimony about their knowledge of the facts and their observations of the bruising to T.T.B. and A.R.B. The jury also saw the photographs of the children's bruises. The district judge instructed on the correct legal standard, including the culpable mental state, and after weighing the evidence and making witness credibility determinations, the jury found Burton guilty. Viewing the evidence in the light most favorable to the State, we find the evidence was sufficient to support a rational factfinder's verdicts of guilty on the two counts of abuse of a child.

Affirmed.