NOT DESIGNATED FOR PUBLICATION

No. 116,375

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM C. SHOCKEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Nemaha District Court; JOHN L. WEINGART, judge. Opinion filed July 21, 2017. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Brad M. Lippert*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., LEBEN and BRUNS, JJ.

*Per Curiam*:  William C. Shockey appeals from his convictions for two counts of criminal threat. On appeal, Shockey raises multiple issues, including judicial misconduct, prosecutorial error, several jury instruction errors, and cumulative error. Although we note that there were some errors committed at trial, we find each of them to be harmless and none of them to be reversible individually. Likewise, based on our review of the record as a whole, we do not find that these errors denied Shockey the right to a fair trial or that they require reversal of his convictions. Thus, we conclude that Shockey is not entitled to a new trial, and we affirm his convictions.

1

On December 17, 2014, the Corning City Council held a structure violation hearing at the community center to consider condemning three buildings owned by Shockey. At the conclusion of the hearing, the city council decided to condemn the buildings and voted to demolish them. The decision visibly upset Shockey. Before leaving, he pointed at each member of the city council and counted the member as he did so. He then told them, "'I hope you value your lives.'"

As he was leaving the building, Shockey passed the mayor of Corning. He also pointed at her and said something to the effect of, "'I hope you enjoyed your life, girl.'" After the mayor went back inside the community center, she discussed what had happened with the other council members. Because they felt threatened, the council members decided to lock the building and call the sheriff's department to report what had happened.

On May 1, 2015, the volunteer code enforcement officer for Corning, Troy Kramer, went to get gas for his lawn mower. When he arrived, Shockey was there putting gas in his van. Initially, the two greeted each other. However, Shockey evidently recognized Kramer and asked him, "'Who gave you permission to take my stuff?'" Kramer told Shockey that he did not take his property and that the city council passed a resolution condemning his buildings.

After a short discussion regarding the mayor and one of Shockey's buildings that had already been demolished, Kramer reminded Shockey that June 1 was the deadline for the city to demolish another one of Shockey's buildings. According to Kramer, Shockey stepped towards him, pointed his finger at him, looked him in the eye, and said, "'If you're there on June 1, I will kill you.'" Kramer asked Shockey what he had said. In

response, Shockey told Kramer, "'You will die.'" After Shockey drove off, Kramer called the sheriff's department to report the incident.

The State charged Shockey with two counts of criminal threat—the first count arising out of the threat made to the members of the city council and the second count arising out of the threat made to Kramer. On March 1, 2016, the district court held a 1-day jury trial. The State presented the testimony of the city treasurer, the city clerk, the mayor, and three city council members regarding the incident on December 17, 2014. In addition, Kramer testified about the incident on May 1, 2015.

After the State rested, Shockey presented the testimony of a friend, Lan Do, who was in the van during the May 1 incident. According to Do, she initially was not listening to what Shockey was saying to Kramer. She testified that she heard Shockey say, "'The man above . . . will take care of me. If you trespass on my property, you might die.'" The other man asked if Shockey was threatening him, and Shockey responded, "'No, I'm not threaten[ing] you, because I have a man above me taking care of me.'"

After deliberation, the jury found Shockey guilty of both counts. On April 7, 2016, the district court sentenced Shockey to 6 months on each count to run consecutively. However, the district court suspended the sentences to 12 months of probation. As a condition of probation, the district court ordered Shockey to serve 30 days in jail. Thereafter, Shockey timely filed a notice of appeal.

ANALYSIS

*Judicial Misconduct*

Shockey contends that the district court made improper introductory remarks to the jury pool that denied him the right to a fair trial. Whether a judge has committed

3

misconduct depends on the surrounding facts and circumstances. The party alleging judicial misconduct—in this case Shockey—bears the burden of showing that the statements or actions of a judge have prejudiced his substantial rights. "If a proper and reasonable construction will render the conduct unobjectionable, it is not prejudicial." *State v. Hudgins*, 301 Kan. 629, 637-38, 346 P.3d 1062 (2015) (citing *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 [2002]).

Shockey did not object to the district judge's introductory comments to the jury pool. Nevertheless, we can review allegations of judicial misconduct despite the lack of a contemporaneous objection to decide whether a judge's conduct violated a defendant's right to a fair trial. See *State v. Tyler*, 286 Kan. 1087, 1090, 191 P.3d 306 (2008). Accordingly, we will review the comments made by the district judge to the potential jurors in this case to determine if Shockey's substantial rights have been prejudiced.

The district judge made his introductory comments to 50 to 60 potential jurors in the jury pool. After introducing members of the court staff, the district judge introduced the attorneys for each side. In turn, Shockey's attorney introduced his client to the potential jurors. The district judge then explained the role of a jury in the United States system of justice. In doing so, he noted that jury duty is a "call to service," saying:

> "This is your call to service, and many times, sometimes it's the only call to service that we have. And it's . . . important. Think about that.
>
> "In our system, regular folks—you, a jury—get to make the decision. Not me, not, not an employee of the state of Kansas. Not some governmental agency. It's 'we, the people' make the decision."

Although he recognized there are imperfections, the district judge stated his opinion—one that is shared by many Americans—that "our system . . . is the best in the

4

world." He told the potential jurors that "it is the best system in the world . . . because of our basic [tenet] that the rule of law is controlling in this country."

The district judge then gave the following example:

"If you remember—Some of you are too young to remember. But some of you remember that there was in the—when President Nixon was in office, there was [an] issue of a break-in in the Watergate Apartments, and you had the Watergate scandal, and who was responsible, who knew, and all that things.

"And it was discovered during the investigation that there was tapes made in the Oval Office, tape recordings of all conversations in the Oval Office. So you can imagine the prosecutors for the Justice Department, they wanted to see the tapes. And the President of the United States, the most powerful man in the world, said, 'No, I—I'm not giving you the tapes. This is executive privilege. You can't have the tapes.'

"So they went to—Where did they go? They went to the court system. Went all the way to the United States Supreme Court. The United States Supreme Court issued a one-page document that said, 'No, you have to turn the tapes over.'

"So how did that order get carried out? Well, the clerk of the United States Supreme Court, he's about 5-foot-7, weighs about 160 pounds, wears glasses, has always wore a nice white shirt. He takes the order, he walks down Pennsylvania Avenue, goes to the White House, serves the paper.

"And what happens? The President of the United States, the most powerful man in the world, surrenders the tapes. No tanks in the street. No militia, no military, no take-over, no nothing. It was the rule of law.

"And that's essentially what works. And that's why our system is beyond—is beyond comparison. It is the greatest system."

The district judge also used the example of a law enforcement officer in Hesston—who had responded to a tragic factory shooting a few days earlier—to demonstrate the importance of public service. Specifically, he stated:

> "[The Hesston Police Chief is] paid modest wages. And what does that man do? He has a bulletproof vest on. He responds to a call where there's fire—a firearms being discharged at the Excel plant. He goes, doesn't wait for backup. Goes, because there's people inside. He goes, encounters the assailant, assailant shoots at him. He returns fire and kills the assailant.

> "Now, that's public service to me. You know, if I'm sitting here, and I have to worry about whether or not I have to take a day for my jury to inconvenience my job and stuff like that, it's kind of pale in comparison, you know.

> "Like firemen, when we ask the firemen to go up the 9/11, up the Twin Towers to rescue people, and they knew there was a good chance, they do it. That's public— That's public service.

> "So your public service is important. But there is various levels of public service, the military service and things like that."

Shockey argues that these introductory statements made by the district judge to the jury pool violated his right to a fair trial. Certainly, it is not unusual for a district judge to make introductory comments to potential jurors on the importance of jury service or the essential role that jurors play in our system of justice. It is also not unusual for a district judge to explain the importance of the rule of law. We do not find that these introductory comments showed favoritism to either party. Likewise, we do not find that they prejudiced Shockey's right to a fair trial decided by an impartial jury.

Nevertheless, Shockey maintains that even if the comments regarding Watergate did not constitute judicial misconduct in and of themselves, they were prejudicial in light of the allegations made against him. Shockey claims that the jury could have taken the

6

district judge's story to mean that he should have responded to the city condemning his property in a manner similar to former President Nixon's response after being ordered to turn over the infamous tapes. Shockey alleges that the prosecutor referring back to the district judge's introductory comments about Watergate in closing argument exacerbated the potential prejudice. In closing, the State argued, "Did President Nixon stand before the U.S. Supreme Court and count them down, tell them he hoped they valued their lives? No, he turned them—because that's what we do in the United States of America. We have rules; we have laws."

Similarly, Shockey maintains that using the example of the shootings in Hesston—that occurred well after the incidents for which he was charged—could have prejudiced the jurors by causing them to equate this case with the gunman at the Excel plant. Shockey suggests that the potential for prejudice was emphasized when one of the State's witnesses was asked what prompted the people at the structure violation hearing to call law enforcement. In response, the witness said, "It was simply, this day and age, we don't know who to trust. And you don't know what, what he might be capable of." When another witness for the State was asked a similar question, he responded:  "Well, you know, when, when you get those kind of threats, you kind of discuss it. You hear—You hear things going on in the world, so it—You have to try to decide, decide whether you need to do something about it. And so we did."

We do not find that the mere possibility of prejudice from the district judge's introductory remarks to the potential jurors is a sufficient basis for us to overturn the verdict rendered by the jury after considering the evidence and being instructed on the law. As noted above, "[i]n order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. at 118. It is Shockey's burden to show that judicial misconduct prejudiced his substantial

rights to a fair trial, and we do not find that he has met his burden. Thus, we conclude that the district judge's introductory comments to the jury pool did not constitute judicial misconduct.

*Jury Instructions*

Shockey contends that the district court committed five jury instruction errors. In reviewing alleged jury instruction errors, we first consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, we use an unlimited review to determine whether the instruction was legally appropriate; then, we determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, that would have supported a particular instruction; and finally, if we conclude that the district court erred, we must determine whether the error was harmless. *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013); see *City of Neodesha v. BP Corporation*, 50 Kan. App. 2d 731, 745-46, 334 P.3d 830 (2014).

If a party fails to object to the giving of or failing to give a jury instruction, we may only consider whether the giving or the failure to give the instruction is clearly erroneous so that it affects a party's substantial rights. K.S.A. 2016 Supp. 60-251(d)(2). We use a two-step process in determining whether the challenged jury instruction is clearly erroneous. First, we must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate based on an unlimited review of the entire record. If we find that the newly requested instruction was legally and factually appropriate or that the instructions as given were not legally and factually appropriate, we must then decide whether we are firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming error in the instructions—in this case Shockey—has the burden to

8

prove the degree of prejudice necessary for reversal. See *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013).

On appeal, Shockey contends that the district court erred in failing to instruct the jury on the definition of the word "threat" as used in K.S.A. 2016 Supp. 21-5415(a)(1). He candidly admits, however, that he did not request such an instruction at trial nor did he object to its omission. Accordingly, we review this issue for clear error.

The jury instructions containing the elements of the criminal threat charges stated:

"In Count I, the defendant is charged with criminal threat. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant threatened to commit violence and communicated the threat with the intent to place another in fear, to wit:  Troy Kramer.

"2. This act occurred on or about the 1st day of May, 2015, in Nemaha County, Kansas.

"In Count II, the defendant is charged with criminal threat. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant threatened to commit violence and communicated the threat with the intent to place another in fear, to wit:  members of the Corning City Council.

"2. This act occurred on or about the 17th day of December, 2014, in Nemaha County, Kansas.

> "The State must prove that the defendant's actions were intentionally and knowingly done."

Shockey argues that including a definition of threat in the instruction would have been legally appropriate. In support of this position, he points out that the United States Supreme Court—as well as panels of this court—determined that a criminal threat statute is not unconstitutionally overbroad because it requires that a "true threat" be communicated. See *Virginia v. Black*, 538 U.S. 343, 359-60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); *State v. White*, 53 Kan. App. 2d 44, Syl. ¶ 9, 384 P.3d 13 (2016), *rev. denied* 306 Kan. ___ (April 26, 2017) ("K.S.A. 2015 Supp. 21-5415[a][1] is not overbroad as it is clearly designed to prohibit a limited class of impermissible speech—threats to commit violence, *i.e.*, true threats."). In *White*, this court relied on language from the United States Supreme Court in *Black*, 538 U.S. at 359-60. The Supreme Court held in *Black* that:

> "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations omitted.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' [Citation omitted.]" *Black*, 538 U.S. at 359-60.

Assuming that an instruction defining the word "threat" or "true threat" would have been legally and factually appropriate, this court cannot be firmly convinced the jury would have reached a different verdict without the error. The language in the instruction that was given mirrors the statute and PIK Crim. 4th 54.370 (2016 Supp.). The Kansas Supreme Court has strongly recommended to district courts that they use "PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to [jury] instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015).

10

Here, we find that the criminal threat instructions given properly and fairly stated the law as applied to the facts. The word "threat" is a common word that jurors are likely to understand without assistance. Moreover, the instructions that were given adequately informed the jury that in order to be convicted of a criminal threat, Shockey had to "[threaten] to commit violence" and his statements were made "with the intent to place another in fear." Thus, we do not find the failure to give an instruction defining the word "threat" to be clearly erroneous.

Next, Shockey contends that the district court erred in failing to instruct the jury on the lawful use of force in defense of property other than a dwelling, place of work, or occupied vehicle. Once again, Shockey did not request the instruction that he now claims should have been given nor did he object to its exclusion from the instructions. As such, we must review this issue for clear error.

Shockey argues that the district court should have instructed the jury pursuant to PIK Crim. 4th 52.220 (2016 Supp.), which states:

> "The defendant claims (his) (her) conduct was permitted as a lawful defense of (his) (her) property.

> "A person lawfully in possession of property is permitted to *insert one of the choices from below*:

- use such physical force not likely to cause death or great bodily harm against another person [—including using a weapon—] [—including through the actions of another—]

or

- threaten by words or actions to use physical force against another person [—including a threat to cause death or great bodily harm—]

or

- display to another person a *insert the means of force used*

11

to stop an unlawful interference with (his) (her) property as would appear necessary to a reasonable person under the circumstances then existing."

Shockey maintains that this instruction is legally appropriate because it is based on K.S.A. 2016 Supp. 21-5225, which states:

"A person who is lawfully in possession of property other than a dwelling, place of work or occupied vehicle is justified in the use of force against another for the purpose of preventing or terminating an unlawful interference with such property. Only such use of force as a reasonable person would deem necessary to prevent or terminate the interference may intentionally be used."

The question, however, is whether the instruction was legally or factually appropriate in this case. We find it to be neither under the circumstances presented. Here, the defense of property did not apply because neither Shockey nor his victims were on—or in close proximity to—his property at the time he made the threats. Furthermore, Shockey never claimed at trial that his actions were in defense of his property.

PIK Crim. 4th 52.220 allows "[a] person lawfully in possession of property" to "threaten by words or actions to use physical force against another person . . . as would appear necessary to a reasonable person under the circumstances then existing." At most, Shockey's threats were made in anticipation of a possible interference with his property in the future. There is no evidence in the record to suggest that the threats were made to keep someone from taking his property at the time he made the statements and gestures. Accordingly, we find no clear error in the failure to give a defense of property instruction in this case.

Shockey also contends that his right to a unanimous jury verdict was violated because the district court failed to instruct the jury that its verdict relating to the threat made to members of the city council must be unanimous as to the particular act that

constituted the charge. In some cases, there is a potential for uncertainty as to whether the jury unanimously agreed on a particular act underlying the specific charge. See *State v. De La Torre*, 300 Kan. 591, 595, 331 P.3d 815 (2014). We do not, however, find this to be such a case.

Shockey claims that the State presented evidence at trial that he committed multiple acts of criminal threat in count 2 because he was charged with criminal threat against "members of the Corning City Council." Yet again, Shockey acknowledges he did not request a unanimity instruction. So, we review the record to determine if there is clear error.

Appellate courts apply a three-part framework when reviewing unanimity instruction issues. The first part is determining whether a multiple acts case is presented, which is a question of law subject to unlimited review. If it is a multiple acts case, the next question is whether error was committed. Error occurs in a multiple acts case if the State did not inform the jury on which act to rely or if the district court failed to instruct the jury to agree on the specific act for each charge. Finally, we must determine whether any error found was reversible or harmless under the clearly erroneous standard provided in K.S.A. 2016 Supp. 22-3414(3). *De La Torre*, 300 Kan. at 596.

To determine whether multiple acts have occurred, we must decide whether the defendant's conduct is part of one act or multiple acts that are separate and distinct from each other. *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007). Multiple acts are legally and factually separate incidents that independently satisfy the elements of the charged offense. See *State v. King*, 299 Kan. 372, 379, 323 P.3d 1277 (2014); *State v. Soto*, 299 Kan. 102, 111, 322 P.3d 334 (2014). Incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a criminal act is motivated by a fresh impulse. Factually separate and distinct incidents are not unitary conduct. *De La Torre*, 300 Kan. at 598.

13

Shockey argues that this was a multiple acts case because the State presented evidence that Shockey made threatening statements to multiple city council members inside the community center and then made another threating statement to the mayor as he was leaving the building. Regardless of whether these separate statements are considered multiple acts, however, the State chose to only charge Shockey for threatening to commit one act of violence against the members of the Corning City Council. Because the jury was only instructed to find Shockey guilty on count 2 if the act was committed to members of the city council, the State elected which act upon which it was charging Shockey. Thus, we conclude that the district court did not err in failing to give a unanimity instruction to the jury.

Next, Shockey contends the district court erred in failing to give a limiting instruction regarding the mayor's testimony because she testified regarding an uncharged bad act—the statements Shockey made to her as he left the community center. Although defense counsel asked the district court to strike the mayor's testimony regarding the incident that occurred outside the community center, he did not request a limiting instruction. Hence, we review this issue for clear error.

Because neither count of criminal threat presented to the jury concerned the statement Shockey made to the mayor, we find that it was error for the district court not to give a limiting instruction as required by K.S.A. 2016 Supp. 60-455. Nevertheless, Shockey has failed to meet his burden to show clear error because he has not shown any prejudice that resulted from the failure to give a limiting instruction. Even if Shockey had argued prejudice, we are not convinced that the jury would have reached a different verdict if a limiting instruction had been given. The evidence of Shockey's guilt based on his statements and gestures directed to the members of the city council is not dependent in any way on the mayor's testimony regarding what occurred outside the community center. As such, Shockey has not shown that the failure to give a limiting instruction was clearly erroneous.

14

Further, Shockey contends that the district court erred in failing to instruct the jury on the effect of his having been charged with multiple counts. PIK Crim. 4th 68.060 (2016 Supp.) states:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

The notes on use for this instruction state that it should be given when multiple counts are charged. Although Shockey did not request this instruction, the State concedes that it would have been proper to give this instruction in this case. "The failure to give the multiple-count instruction can be reversible error if the jury is misled into believing that a finding of guilty on one count mandates a finding of guilty on the others. [Citation omitted.]" *State v. Gould*, 271 Kan. 394, 401, 23 P.3d 801 (2001).

In the present case, the two counts of criminal threat were clearly distinguished in the jury instructions. According to the instructions, the jurors were advised that count 1 arose out of the alleged threat of violence made by Shockey against Troy Kramer on May 1, 2015. In contrast, the jurors were advised that count 2 arose out of the alleged threat of violence made by Shockey against the members of the city council on December 17, 2014. Accordingly, we do not find that the jury was confused or misled into believing that a finding of guilt on one count mandated a finding of guilt on the other count.

Shockey also contends that the repeated references to the singular form of "verdict," would have led the jury to believe its decisions in both counts had to be the same. In *Gould*, the defendant argued there was instructional error because separate verdict forms were not provided for each count. However, the Kansas Supreme Court found in *Gould* that there was not reversible error because the jury was given a verdict

15

form that clearly indicated three separate counts of abuse, which included a separate instruction for each count, stating the elements needed to establish each charge. 271 Kan. at 402. Although the two counts against Shockey were both included in instruction number 2, the instruction included separate lists of the elements necessary for a verdict on each count. Likewise, the jury received a separate verdict form for each count. Thus, we conclude that although it would have been proper for the district court to include a PIK Crim. 4th 68.060 instruction in this case, the failure to do so was not clearly erroneous.

*Prosecutorial Error*

Shockey contends that the prosecutor committed error in comments he made during closing arguments. We apply a two-part test for evaluating assertions of prosecutorial error, first determining whether the comments were improper and then deciding whether any improper comments undermined the defendant's right to a fair trial.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

16

Shockey argues that during closing argument, the prosecutor inflamed the passions of the jury, misstated the law and evidence, and improperly appealed to the jury's sense of community. Even though Shockey failed to object to the prosecutor's arguments, "a contemporaneous trial objection is not required to review a prosecutorial [error] claim based on remarks made during . . . closing argument." *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012).

Shockey first complains about the following statements by the prosecutor during closing arguments:  "Now, I submit to you that if Mr. Shockey was found guilty today and he looked at you and did the exact same thing, is that a threat to commit violence? You bet it is. Was it done to place another in fear? Absolutely." Shockey asserts that this statement constitutes a "golden rule" argument. Such arguments are generally considered to be improper because they encourage jurors to place themselves in the position of the parties or victims. See *State v. McHenry*, 276 Kan. 513, 523, 78 P.3d 403 (2003), *disapproved on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

We do not find that the prosecutor's rhetorical question and answer in this case to be an impermissible "golden rule" argument. The prosecutor did not ask the jurors to put themselves in the position of the victims. Instead, the prosecutor presented an example of a similar type of threat and argued that it would be a crime. See *McHenry*, 276 Kan. at 523 (finding the statement was not improper because the jury was not asked to place itself in the position of the victim's brothers and the comment was relevant and stated a legitimate argument separate from invoking the jury's sympathy).

Continuing, Shockey argues that the prosecutor suggested that the jurors would be victims themselves if they convicted Shockey. However, we do not find that the prosecutor's comment made such a suggestion. Rather, we find the comment to fall within the wide latitude prosecutors are afforded during closing arguments.

17

Next, Shockey maintains that the prosecutor committed error when he referred back to the district judge's introductory comments regarding the importance of the rule of law. Specifically, the prosecutor argued:

"[The district judge], before this trial started, talked about when the clerk of the U.S. Supreme Court delivered an order for Richard Nixon to turn over the tapes, something which would lead first to his impeachment and then to his resignation. Did President Nixon threaten the clerk? Did President Nixon stand before the U.S. Supreme Court and count them down, tell them he hoped they valued their lives? No, he turned them [in] because that's what we do in the United States of America. We have rules; we have laws.

"And when the Corning [C]ity [C]ouncil goes through the rigmarole that they have to under their code to condemn somebody's property, even if you don't agree with their decision, even if their decision was wrong, you don't threaten their lives.

. . . .

"In the United States of America, that's not the way to act."

Shockey attempts to compare this statement to the statements found to be improper in *State v. Witten*, 45 Kan. App. 2d 544, 251 P.3d 74, *rev. denied* 293 Kan. 1114 (2011). In *Witten*, a panel of this court held that the prosecutor improperly attempted to inflame the passions of the jury and asked the jury to protect the community by stating:

"'We know about the drug activities. We know things are going on. We hear about methamphetamines and now we're addressing a real problem. We're addressing a real situation. Somebody in our community is selling methamphetamines. Now it's up to you and I ask you to find Mr. Witten guilty on both counts.'" 45 Kan. App. 2d at 553.

18

A panel of this court found that this argument was improper because it intended to appeal to the passions of the jurors and injected facts not in evidence since none of the police witnesses testified that the sale of methamphetamine was a serious issue in Pratt, where the crime occurred. 45 Kan. App. 2d at 553-54. Even so, the error by the prosecutor was found to have been harmless under K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Witten*, 45 Kan. App. 2d at 554-55.

The State contends that the prosecutor's argument regarding the importance of following the rule of law was made in rebuttal of "defense counsel's suggestion that the jury ignore the law and not make into a felon 'a man that just wants to be left alone and not worry about his property being taken or destroyed.'" The State further maintains that the prosecutor was not intending to inflame the passions or prejudices of the jury but was imploring the jury to decide the case based on the evidence and controlling law. Accordingly, we also find this argument to fall within the wide latitude allowed during closing.

Regardless, even if the arguments were found to constitute prosecutorial error, prosecutorial error is harmless if there is no reasonable possibility that the error contributed to the verdict. In other words, the arguments must not have prejudiced Shockey's right to a fair trial. See *Sherman*, 305 Kan. at 109. A review of the record reveals that despite Shockey's defense that he did not intend to act on his threats, the evidence presented in this case regarding the words and gestures used by Shockey when confronting the members of the city council as well as when confronting Kramer at a gas station several months later was overwhelming. This evidence was more than sufficient for a jury to conclude beyond a reasonable doubt that on both occasions Shockey threatened to commit violence and communicated his threats with the intent to place others in fear for their safety. Thus, we conclude that the State can demonstrate beyond a reasonable doubt that the errors complained of did not affect the outcome of the trial.

19

*Cumulative Error*

Finally, Shockey contends that even if none of the trial errors noted above are reversible on their own, the cumulative effect of these errors denied him the right to a fair trial. When reviewing whether cumulative errors require reversal of a defendant's convictions, we must determine whether the totality of the circumstances establish that the cumulative errors substantially prejudiced the defendant. In particular, we must determine whether the defendant was denied his or her right to a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 212 (2014).

In this case, one could reasonably argue that the trial court made three errors: (1) failing to give a limiting instruction as required by K.S.A. 2016 Supp. 60-455; (2) failing to give a multiple-counts instruction; and (3) failing to intercede when the prosecutor made a potentially improper argument about community safety. In each case, we have found that there was no clear error or that any error was harmless individually. In determining whether combined errors denied Shockey of a fair trial, we must examine "the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *Holt*, 300 Kan. at 1007. Nevertheless, prejudicial error will not be found in circumstances where the evidence against the defendant is overwhelming. 300 Kan. at 1007.

Even if we consider all three of the items listed above as trial errors and considered them together, we do not find that they necessitate reversal of Shockey's convictions. As noted above, we find the evidence to be overwhelming regarding the words and gestures that Shockey directed towards the city council members and towards Kramer. Moreover, we find the evidence in both instances to prove beyond a reasonable doubt that Shockey threatened to commit violence and that he communicated his threats

20

with the intent to place others in fear for their safety. Ultimately, although Shockey did not receive a perfect trial, he received a fair one. See *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 (2016) (citing *State v. Todd*, 299 Kan. 263, 286-87, 323 P.3d 829 [2014]). Accordingly, based on the totality of the circumstances, we conclude that Shockey's right to a fair trial was not prejudiced.

Affirmed.